(Slip Opinion) OCTOBER TERM, 2010 1

Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SYKES *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 09–11311.   Argued January 12, 2011—Decided June 9, 2011

When he pleaded guilty to being a felon in possession of a firearm, see 8 U. S. C. §922(g)(1), petitioner Sykes had prior convictions for at least three felonies, including the state-law crime of "us[ing] a vehicle" to "knowingly or intentionally" "fle[e] from a law enforcement officer" after being ordered to stop, Ind. Code §35–44–3–3(b)(1)(A) (2004). The Federal District Court decided that the prior convictions subjected Sykes to the 15-year mandatory minimum prison term that the Armed Career Criminal Act (ACCA), 18 U. S. C. §924(e), provides for an armed defendant who has three prior "violent felony" convictions. Rejecting Sykes' argument that his vehicle flight felony was not "violent" under ACCA, the Seventh Circuit affirmed.

*Held:* Felony vehicle flight, as proscribed by Indiana law, is a violent felony for purposes of ACCA. Pp. 5–14.

   (a) The "categorical approach" used to determine if a particular crime is a violent felony "consider[s] whether the elements of the offense are of the type that would justify its inclusion within the residual provision [of 18 U. S. C. §924(e)(2)(B)], without inquiring into the specific conduct of th[e] particular offender." *James* v. *United States*, 550 U. S. 192, 202 (emphasis deleted). When punishable by more than one year in prison, burglary, arson, extortion, and crimes that involve use of explosives are violet felonies. Under the residual clause in question so too is a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another," §924(e)(2)(B)(ii), *i.e.,* a risk "comparable to that posed by its closest analog among" the statute's enumerated offenses. *Id.*, at 203. When a perpetrator flees police in a car, his determination to elude capture makes a lack of concern for the safety of others an inherent part of the offense. Even if he drives without going full speed or the wrong

way, he creates the possibility that police will, in a legitimate and lawful manner, exceed or almost match his speed or use force to bring him within their custody. His indifference to these collateral consequences has violent—even lethal—potential for others. A fleeing criminal who creates a risk of this dimension takes action similar in degree of danger to that involved in arson, which also entails intentional release of a destructive force dangerous to others. Also telling is a comparison to burglary, which is dangerous because it can end in confrontation leading to violence. In fact, the risks associated with vehicle flight may outstrip the dangers of both burglary and arson. While statistics are not dispositive, studies show that the risk of personal injuries is about 20% lower for each of those enumerated crimes than for vehicle pursuits. Thus, Indiana's prohibition on vehicle flight falls within §924(e)(2)(B)(ii)'s residual clause because, as a categorical matter, it presents a serious potential risk of physical injury to another. Pp. 5–9.

(b) Sykes' argument—that *Begay* v. *United States*, 553 U. S. 137, and *Chambers* v. *United States*, 555 U. S. 122, require ACCA predicate crimes to be purposeful, violent, and aggressive in ways that vehicle flight is not—overreads those opinions. In general, levels of risk divide crimes that qualify as violent felonies from those that do not. *Chambers* is no exception: It explained that failure to report does not qualify because the typical offender is not "significantly more likely than others to attack, or physically to resist, an apprehender." 555 U. S., at ___–___. *Begay,* which held that driving under the influence (DUI) is not an ACCA predicate and stated that it is not purposeful, violent, and aggressive, 553 U. S., at 145–148, is the Court's sole residual clause decision in which risk was not the dispositive factor. But *Begay* also gave a more specific reason for its holding: DUI "need not be purposeful or deliberate," *id.,* at 145, and is analogous to strict-liability, negligence, and recklessness crimes. *Begay*'s "purposeful, violent, and aggressive" phrase is an addition to the statutory text that has no precise link to the residual clause. Because vehicle flight is not a strict-liability, negligence, or recklessness crime and is, as a categorical matter, similar in risk to the crimes listed in the residual clause, it is a violent felony. Pp. 10–11

(c) Sykes contends that the fact that Ind. Code §35–44–3–3(b)(1)(B) criminalizes flight by an offender who "operates a vehicle in a manner that creates a substantial risk of bodily injury to another person" indicates that Indiana did not intend for §35–44–3–3(b)(1)(A), under which he was convicted, to encompass the particular class of vehicle flights reached by subsection (b)(1)(B). This argument is unconvincing. Indiana treats the two subsections as felonies of the same magnitude carrying similar prison terms, suggesting that subsection

(b)(1)(A) is roughly equivalent to one type of subsection (b)(1)(B) violation.  Pp. 11–13.

(d) Congress framed ACCA in general and qualitative, rather than encyclopedic, terms.  The residual clause imposes enhanced punishment for unlawful firearm possession when the relevant prior offenses involved a potential risk of physical injury similar to that presented by several enumerated offenses.  It instructs potential recidivists regarding the applicable sentencing regime if they again transgress.  This intelligible principle provides guidance, allowing a person to conform his conduct to the law.  While this approach may at times be more difficult for courts to implement, it is within congressional power to enact.  Pp. 13–14.

598 F. 3d 334, affirmed

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, ALITO, and SOTOMAYOR, JJ., joined.  THOMAS, J., filed an opinion concurring in the judgment.  SCALIA, J., filed a dissenting opinion.  KAGAN, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–11311

MARCUS SYKES, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 9, 2011]

JUSTICE KENNEDY delivered the opinion of the Court.

It is a federal crime for a convicted felon to be in unlawful possession of a firearm. 18 U. S. C. §922(g)(1). The ordinary maximum sentence for that crime is 10 years of imprisonment. §924(a)(2). If, however, when the unlawful possession occurred, the felon had three previous convictions for a violent felony or serious drug offense, the punishment is increased to a minimum term of 15 years. §924(e). The instant case is another in a series in which the Court is called upon to interpret §924(e) to determine if a particular previous conviction was for a "violent felony," as that term is used in the punishment enhancement statute. See *James* v. *United States*, 550 U. S. 192 (2007); *Begay* v. *United States*, 553 U. S. 137 (2008); *Chambers* v. *United States*, 555 U. S. 122 (2009).

In this case the previous conviction in question is under an Indiana statute that makes it a criminal offense whenever the driver of a vehicle knowingly or intentionally "flees from a law enforcement officer." Ind. Code §35–44–3–3 (2004). The relevant text of the statute is set out in the discussion below. For the reasons explained, the vehicle flight that the statute proscribes is a violent felony

as the federal statute uses that term.

## I

Petitioner Marcus Sykes pleaded guilty to being a felon in possession of a firearm, 18 U. S. C. §922(g)(1), in connection with an attempted robbery of two people at gunpoint. Sykes had previous convictions for at least three felonies. On two separate occasions Sykes used a firearm to commit robbery, in one case to rob a man of his $200 wristwatch and in another to rob a woman of her purse.

His third prior felony is the one of concern here. Sykes was convicted for vehicle flight, in violation of Indiana's "resisting law enforcement" law. Ind. Code §35–44–3–3. That law provides:

> "(a) A person who knowingly or intentionally:
>
> "(1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of his duties as an officer;
>
> "(2) forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court; or
>
> "(3) flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop;
>
> "commits resisting law enforcement, a Class A misdemeanor, except as provided in subsection (b).
>
> "(b) The offense under subsection (a) is a:
>
> "(1) Class D felony if:
>
> "(A) the offense is described in subsection (a)(3) and the person uses a vehicle to commit the offense; or
>
> "(B) while committing any offense described in subsection (a), the person draws or uses a deadly weapon, inflicts bodily injury on another person, or operates a vehicle in a manner that creates a substantial risk of bodily injury to another person;

　　"(2) Class C felony if, while committing any offense described in subsection (a), the person operates a vehicle in a manner that causes serious bodily injury to another person; and

　　(3) Class B felony if, while committing any offense described in subsection (a), the person operates a vehicle in a manner that causes the death of another person."

　　Here, as will be further explained, Sykes used a vehicle to flee after an officer ordered him to stop, which was, as the statute provides, a class D felony. The Court of Appeals of Indiana has interpreted the crime of vehicle flight to require "a knowing attempt to escape law enforcement." *Woodward* v. *State*, 770 N. E. 2d 897, 901 (2002) (internal quotation marks omitted). *Woodward* involved a driver who repeatedly flashed his bright lights and failed to obey traffic signals. *Id.*, at 898. When an officer activated his emergency equipment, the defendant became "aware . . . that [the officer] wanted him to pull his vehicle over," but instead drove for a mile without "stopping, slowing, or otherwise acknowledging" the officer because, he later testified, he "was 'trying to rationalize why [he] would be pulled over.'" *Id.*, at 898, 901. Though the defendant later claimed that he was also seeking a "well-lighted place to stop where there would be someone who knew him," *id.*, at 901, his actions suggested otherwise. He passed two gas stations, a food outlet store, and a McDonald's before pulling over. When he got out of the car, he began to shout profanities at the pursuing officer. *Ibid.* By that time, the officer had called for backup and exited his own vehicle with his gun drawn. *Id.*, at 898. In answering the defendant's challenge to the sufficiency of the above evidence, the Indiana court held that because he knew that a police officer sought to stop him, the defendant could not "choose the location of the stop" and insist on completing

the stop "on his own terms," as he had done, "without adequate justification," which he lacked. *Id.*, at 901–902.

In the instant case a report prepared for Sykes' federal sentencing describes the details of the Indiana crime. After observing Sykes driving without using needed headlights, police activated their emergency equipment for a traffic stop. Sykes did not stop. A chase ensued. Sykes wove through traffic, drove on the wrong side of the road and through yards containing bystanders, passed through a fence, and struck the rear of a house. Then he fled on foot. He was found only with the aid of a police dog.

The District Court decided that his three prior convictions, including the one for violating the prohibition on vehicle flight in subsection (b)(1)(A) of the Indiana statute just discussed, were violent felonies for purposes of §924(e) and sentenced Sykes to 188 months of imprisonment. On appeal Sykes conceded that his two prior robbery convictions were violent felonies. He did not dispute that his vehicle flight offense was a felony, but he did argue that it was not violent. The Court of Appeals for the Seventh Circuit affirmed. 598 F. 3d 334 (2010). The court's opinion was consistent with the rulings of the Courts of Appeals in the First, Fifth, Sixth, and Tenth Circuits. *Powell* v. *United States*, 430 F. 3d 490 (CA1 2005) *(per curiam); United States* v. *Harrimon*, 568 F. 3d 531, 534–537 (CA5 2009); *United States* v. *LaCasse*, 567 F. 3d 763, 765–767 (CA6 2009); *United States* v. *McConnell*, 605 F. 3d 822, 827–830 (CA10 2010) (finding the flight to be a "crime of violence" under the "nearly identical" §4B1.2(a)(2) of the United States Sentencing Guidelines). It was in conflict with a ruling by a Court of Appeals for the Eleventh Circuit in *United States* v. *Harrison*, 558 F. 3d 1280, 1291–1296 (2009), and at least in tension, if not in conflict, with the reasoning of the Court of Appeals for the Eighth Circuit in *United States* v. *Tyler*, 580 F. 3d 722, 724–726 (2009), and for the Ninth Circuit in *United States* v. *Kelly*,

422 F. 3d 889, 892–897 (2005), *United States* v. *Jennings*, 515 F. 3d 980, 992–993 (2008), and *United States* v. *Peterson*, No. 07–30465, 2009 WL 3437834, *1 (Oct. 27, 2009). The writ of certiorari, 561 U. S. \_\_\_ (2010), allows this Court to address the conflict.

## II

In determining whether an offense is a violent felony, this Court has explained,

> "we employ the categorical approach . . . . Under this approach, we look only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction. That is, we consider whether the *elements of the offense* are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of this particular offender." *James*, 550 U. S., at 202 (internal quotation marks and citations omitted); see also *Taylor* v. *United States*, 495 U. S. 575, 599–602 (1990).

So while there may be little doubt that the circumstances of the flight in Sykes' own case were violent, the question is whether §35–44–3–3 of the Indiana Code, as a categorical matter, is a violent felony.

Under 18 U. S. C. §924(e)(2)(B), an offense is deemed a violent felony if it is a crime punishable by more than one year of imprisonment that

> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> "(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

Resisting law enforcement through felonious vehicle flight

does not meet the requirements of clause (i), and it is not among the specific offenses named in clause (ii). Thus, it is violent under this statutory scheme only if it fits within the so-called residual provision of clause (ii). To be a violent crime, it must be an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another."

The question, then, is whether Indiana's prohibition on flight from an officer by driving a vehicle—the violation of Indiana law for which Sykes sustained his earlier conviction—falls within the residual clause because, as a categorical matter, it presents a serious potential risk of physical injury to another. The offenses enumerated in §924(e)(2)(B)(ii)—burglary, extortion, arson, and crimes involving use of explosives—provide guidance in making this determination. For instance, a crime involves the requisite risk when "the risk posed by [the crime in question] is comparable to that posed by its closest analog among the enumerated offenses." *James*, 550 U. S., at 203 (explaining that attempted burglary poses risks akin to that of completed burglary).

When a perpetrator defies a law enforcement command by fleeing in a car, the determination to elude capture makes a lack of concern for the safety of property and persons of pedestrians and other drivers an inherent part of the offense. Even if the criminal attempting to elude capture drives without going at full speed or going the wrong way, he creates the possibility that police will, in a legitimate and lawful manner, exceed or almost match his speed or use force to bring him within their custody. A perpetrator's indifference to these collateral consequences has violent—even lethal—potential for others. A criminal who takes flight and creates a risk of this dimension takes action similar in degree of danger to that involved in arson, which also entails intentional release of a destructive force dangerous to others. This similarity is a begin-

ning point in establishing that vehicle flight presents a
serious potential risk of physical injury to another.

Another consideration is a comparison to the crime of
burglary. Burglary is dangerous because it can end in
confrontation leading to violence. *Id.*, at 200. The same is
true of vehicle flight, but to an even greater degree. The
attempt to elude capture is a direct challenge to an offi-
cer's authority. It is a provocative and dangerous act that
dares, and in a typical case requires, the officer to give
chase. The felon's conduct gives the officer reason to
believe that the defendant has something more serious
than a traffic violation to hide. In Sykes' case, officers
pursued a man with two prior violent felony convictions
and marijuana in his possession. In other cases officers
may discover more about the violent potential of the flee-
ing suspect by running a check on the license plate or by
recognizing the fugitive as a convicted felon. See, *e.g.*,
*Arizona* v. *Gant*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 2).

Because an accepted way to restrain a driver who poses
dangers to others is through seizure, officers pursuing
fleeing drivers may deem themselves duty bound to esca-
late their response to ensure the felon is apprehended.
*Scott* v. *Harris*, 550 U. S. 372, 385 (2007), rejected the
possibility that police could eliminate the danger from a
vehicle flight by giving up the chase because the perpetra-
tor "might have been just as likely to respond by continu-
ing to drive recklessly as by slowing down and wiping his
brow." And once the pursued vehicle is stopped, it is
sometimes necessary for officers to approach with guns
drawn to effect arrest. Confrontation with police is the
expected result of vehicle flight. It places property and
persons at serious risk of injury.

Risk of violence is inherent to vehicle flight. Between
the confrontations that initiate and terminate the inci-
dent, the intervening pursuit creates high risks of crashes.
It presents more certain risk as a categorical matter than

burglary.  It is well known that when offenders use motor vehicles as their means of escape they create serious potential risks of physical injury to others.  Flight from a law enforcement officer invites, even demands, pursuit. As that pursuit continues, the risk of an accident accumulates.  And having chosen to flee, and thereby commit a crime, the perpetrator has all the more reason to seek to avoid capture.

Unlike burglaries, vehicle flights from an officer by definitional necessity occur when police are present, are flights in defiance of their instructions, and are effected with a vehicle that can be used in a way to cause serious potential risk of physical injury to another.  See *post,* at 5–6 (THOMAS, J., concurring in judgment); see also *post*, at 6–7 (listing Indiana cases addressing ordinary intentional vehicle flight and noting the high-risk conduct that those convictions involved).

Although statistics are not dispositive, here they confirm the commonsense conclusion that Indiana's vehicular flight crime is a violent felony.  See *Chambers*, 555 U. S., at 129 (explaining that statistical evidence sometimes "helps provide a conclusive . . . answer" concerning the risks that crimes present).  As JUSTICE THOMAS explains, chase-related crashes kill more than 100 nonsuspects every year.  See *post*, at 4–5.  Injury rates are much higher.  Studies show that between 18% and 41% of chases involve crashes, which always carry a risk of injury, and that between 4% and 17% of all chases end in injury.  See *ibid*.

A 2008 International Association of Chiefs of Police (IACP) study examined 7,737 police pursuits reported by 56 agencies in 30 States during 2001–2007.  C. Lum & G. Fachner, Police Pursuits in an Age of Innovation and Reform 54.  Those pursuits, the study found, resulted in 313 injuries to police and bystanders, a rate of slightly over 4 injuries to these nonsuspects per 100 pursuits.  *Id.,*

at 57. Given that police may be least likely to pursue suspects where the dangers to bystanders are greatest— *i.e.,* when flights occur at extraordinarily high speeds— it is possible that risks associated with vehicle flight are even higher.

Those risks may outstrip the dangers of at least two offenses enumerated in 18 U. S. C. §924(e)(2)(B)(ii). According to a study by the Department of Justice, approximately 3.7 million burglaries occurred on average each year in the United States between 2003 and 2007. Bureau of Justice Statistics, S. Catalano, Victimization during Household Burglary 1 (Sept. 2010). Those burglaries resulted in an annual average of approximately 118,000 injuries, or 3.2 injuries for every 100 burglaries. *Id.,* at 9– 10. That risk level is 20% lower than that which the IACP found for vehicle pursuits.

The U. S. Fire Administration (USFA) maintains the world's largest data bank on fires. It secures participation from over one-third of U. S. fire departments. It reports an estimated 38,400 arsons in 2008. Those fires resulted in an estimated 1,255 injuries, or 3.3 injuries per 100 arsons. USFA, Methodology Used in the Development of the Topical Fire Research Series, http://www.usfa.dhs.gov/ downloads/pdf/tfrs/methodology.pdf (all Internet materials as visited June 3, 2011, and available in Clerk of Court's case file); USFA, Nonresidential Building Intentional Fire Trends (Dec. 2010), http://www.usfa.dhs.gov/downloads/ pdf/statistics/nonres_bldg_intentional_fire_trends.pdf; USFA, Residential Building Causes, http://www.usfa.dhs.gov/ downloads/xls/estimates/res_bldg_fire_cause.xlsx; USFA Residential and Nonresidential Fire Estimate Summaries, 2003–2009, http://www.usfa.dhs.gov/statistics/estimates/ index.shtm. That risk level is about 20% lower than that reported by the IACP for vehicle flight.

### III

Sykes argues that, regardless of risk level, typical vehicle flights do not involve the kinds of dangers that the Armed Career Criminal Act's (ACCA) residual clause demands. In his view this Court's decisions in *Begay* and *Chambers* require ACCA predicates to be purposeful, violent, and aggressive in ways that vehicle flight is not. Sykes, in taking this position, overreads the opinions of this Court.

ACCA limits the residual clause to crimes "typically committed by those whom one normally labels 'armed career criminals,'" that is, crimes that "show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger." *Begay*, 553 U. S., at 146. In general, levels of risk divide crimes that qualify from those that do not. See, *e.g., James*, 550 U. S. 192 (finding attempted burglary risky enough to qualify). *Chambers* is no exception. 555 U. S., at ___–___ (slip op., at 5–6) (explaining that failure to report does not qualify because the typical offender is not "significantly more likely than others to attack, or physically to resist, an apprehender").

The sole decision of this Court concerning the reach of ACCA's residual clause in which risk was not the dispositive factor is *Begay*, which held that driving under the influence (DUI) is not an ACCA predicate. There, the Court stated that DUI is not purposeful, violent, and aggressive. 553 U. S., at 145–148. But the Court also gave a more specific reason for its holding. "[T]he conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate," *id.,* at 145 (analogizing DUI to strict-liability, negligence, and recklessness crimes). By contrast, the Indiana statute at issue here has a stringent *mens rea* requirement. Violators must act "knowingly or intentionally." Ind. Code §35–44–3–3(a); see *Woodward*, 770 N. E. 2d, at 901 (construing the

statute to require "a knowing attempt to escape law enforcement" (internal quotation marks omitted)).

The phrase "purposeful, violent, and aggressive" has no precise textual link to the residual clause, which requires that an ACCA predicate "otherwise involv[e] conduct that presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii). The *Begay* phrase is an addition to the statutory text. In many cases the purposeful, violent, and aggressive inquiry will be redundant with the inquiry into risk, for crimes that fall within the former formulation and those that present serious potential risks of physical injury to others tend to be one and the same. As between the two inquiries, risk levels provide a categorical and manageable standard that suffices to resolve the case before us.

*Begay* involved a crime akin to strict liability, negligence, and recklessness crimes; and the purposeful, violent, and aggressive formulation was used in that case to explain the result. The felony at issue here is not a strict liability, negligence, or recklessness crime and because it is, for the reasons stated and as a categorical matter, similar in risk to the listed crimes, it is a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii).

## IV

Sykes finds it significant that his flight conviction was not under the Indiana provision that criminalizes flight in which the offender "operates a vehicle in a manner that creates a substantial risk of bodily injury to another person." Ind. Code §35–44–3–3(b)(1)(B). In structuring its laws in this way, Sykes contends, Indiana confirmed that it did not intend subsection (b)(1)(A)'s general prohibition on vehicle flight to encompass the particular class of vehicle flights that subsection (b)(1)(B) reaches.

Sykes' argument is unconvincing. Indiana treats viola-

tions of subsections (b)(1)(A) and (b)(1)(B) as crimes of the same magnitude. They are both class D felonies, and both carry terms of between six months and three years, Ind. Code §35–50–2–7(a). The distinction between the provisions is their relationship to subsection (a), which prohibits, among other acts, much conduct in which a person "(1) forcibly resists, obstructs, or interferes with a law enforcement officer . . . ; (2) forcibly resists, obstructs, or interferes with the authorized service or execution of . . . process . . . ; or (3) flees from a law enforcement officer." §35–44–3–3(a). Subsection (b)(1)(A) only involves the conduct barred by subsection (a)(3)—flight—which, it states, is a felony whenever committed with a vehicle. Under subsection (b)(1)(B), by contrast, any of the offenses in subsection (a) is a felony if the offender commits it while using a vehicle to create a substantial risk of bodily injury to another. Taken together, the statutory incentives always favor prosecuting vehicle flights under subsection (b)(1)(A) rather than subsection (b)(1)(B). They reflect a judgment that some offenses in subsection (a) can be committed without a vehicle or without creating substantial risks. They reflect the further judgment that this is not so for vehicle flights.

Serious and substantial risks are an inherent part of vehicle flight. Under subsection (b)(1)(A), they need not be proved separately to secure a conviction equal in magnitude to those available for other forms of resisting law enforcement with a vehicle that involve similar risks.

In other words, the "similarity in punishment for these related, overlapping offenses suggests that [subsection (b)(1)(A)] is the rough equivalent of one type of [subsection (b)(1)(B)] violation." *Post*, at 10 (THOMAS, J., concurring in judgment); see also *ibid.*, n. 2. By adding subsection (b)(1)(A) in 1998, the Indiana Legislature determined that subsection (b)(1)(A) by itself sufficed as a basis for the punishments available under subsection (b)(1)(B). *Post*, at

10–11; see also *post,* at 10, n. 2 (identifying reckless endangerment statutes with similar structures); cf. *post*, at 12 (explaining that because in most cases Indiana does not "specify what additional punishment is warranted when [a] crime kills or injures," its provisions creating higher penalties for vehicle flights that do so reflect a judgment that these flights are "inherently risky").

The Government would go further and deem it irrelevant under the residual clause whether a crime is a lesser included offense even in cases where that offense carries a less severe penalty than the offense that includes it. As the above discussion indicates, however, the case at hand does not present the occasion to decide that question.

## V

Congress chose to frame ACCA in general and qualitative, rather than encyclopedic, terms. It could have defined violent felonies by compiling a list of specific covered offenses. Under the principle that all are deemed to know the law, every armed felon would then be assumed to know which of his prior felonies could serve to increase his sentence. Given that ACCA "requires judges to make sometimes difficult evaluations of the risks posed by different offenses," this approach could simplify adjudications for judges in some cases. *James*, 550 U. S., at 210, n. 6.

Congress instead stated a normative principle. The residual clause imposes enhanced punishment for unlawful possession of the firearm when the relevant prior offenses involved a potential risk of physical injury similar to that presented by burglary, extortion, arson, and crimes involving use of explosives. The provision instructs potential recidivists regarding the applicable sentencing regime if they again transgress. It states an intelligible principle and provides guidance that allows a person to "conform his or her conduct to the law." *Chicago* v. *Morales*, 527 U. S.

41, 58 (1999) (plurality opinion). Although this approach may at times be more difficult for courts to implement, it is within congressional power to enact. See *James, supra,* at 210, n. 6 (giving examples of federal laws similar to ACCA's residual clause); see also 18 U. S. C. §1031(b)(2) ("conscious or reckless risk of serious personal injury"); §2118(e)(3) ("risk of death, significant physical pain . . ."); §2246(4) ("substantial risk of death, unconsciousness, extreme physical pain . . ."); §2258B(b)(2)(B) (2006 ed., Supp. III) ("substantial risk of causing physical injury"); §3286(b) (2006 ed.) ("forseeable risk of . . . death or serious bodily injury to another person" (footnote omitted)); §4243(d) ("substantial risk of bodily injury to another person"); §§4246(a), (d), (d)(2), (e), (e)(1), (e)(2), (f), (g) (same); §4247(c)(4)(C) (same).

## VI

Felony vehicle flight is a violent felony for purposes of ACCA. The judgment of the Court of Appeals is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

————

No. 09–11311

————

## MARCUS SYKES, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 9, 2011]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that the Indiana crime of intentional vehicular flight, Ind. Code §35–44–3–3(b)(1)(A) (2004), is a "violent felony" under the Armed Career Criminal Act (ACCA), 18 U. S. C. §924(e)(2)(B)(ii). The majority also correctly refuses to apply the "purposeful, violent, and aggressive" test created in *Begay* v. *United States*, 553 U. S. 137, 145 (2008). However, the majority errs by implying that the "purposeful, violent, and aggressive" test may still apply to offenses "akin to strict liability, negligence, and recklessness crimes." *Ante*, at 11.

The error in imposing that test, which does not appear in ACCA, is well catalogued. See, *e.g.*, *Begay,* 553 U. S.*,* at 150–152 (SCALIA, J., concurring in judgment); *id.,* at 158–159 (ALITO, J., dissenting); *ante*, at 11 (finding "no precise textual link" in the statute). I agree with JUSTICES SCALIA and KAGAN that the majority's partial retreat from *Begay* only further muddies ACCA's residual clause. *Post*, at 1 (SCALIA, J., dissenting); *post*, at 1, n. 1 (KAGAN, J., dissenting).

The only question here is whether, in the ordinary case, using a vehicle to knowingly flee from the police after being ordered to stop "involves conduct that presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii). I believe that it does. Therefore I concur in the judgment.

I

Under Indiana law, intentional vehicular flight is a felony. Any person who "knowingly or intentionally . . . flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop" commits a misdemeanor. Ind. Code §35–44–3–3(a)(3). If the person "uses a vehicle" to flee, however, the offense is elevated to a class D felony. §3(b)(1)(A). That felony, the parties agree, qualifies as a "violent felony" under ACCA if it is "burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B)(ii).

As explained below, Indiana's crime of intentional vehicular flight "involves conduct that presents a serious potential risk of physical injury to another." *Ibid.* The elements of §3(b)(1)(A), compared to those of the enumerated ACCA offense of burglary, suggest that an ordinary violation of §3(b)(1)(A) is far riskier than an ordinary burglary. Statistics, common experience, and Indiana cases support this conclusion.

A

The specific crimes Congress listed as "violent felon-[ies]" in ACCA—arson, extortion, burglary, and use of explosives—provide a "baseline against which to measure the degree of risk" that a nonenumerated offense must present in order to qualify as a violent felony. *James* v. *United States*, 550 U. S. 192, 208 (2007); see also *ante*, at 6. Burglary, for instance, sets a low baseline level for risk. Its elements are "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor* v. *United States*, 495 U. S. 575, 599 (1990). As this Court has recognized, the risk of burglary is in "the possibility that an innocent person might appear while the crime is in progress" and the danger inherent in

such a "face-to-face confrontation." *James*, 550 U. S., at 203. The chance of an interruption or confrontation in an ordinary burglary is, of course, quite small; burglars generally plan and commit their crimes with an eye toward avoiding detection. Nevertheless, that small chance sufficed for Congress to list burglary as a "violent felony," and for this Court to hold that attempted burglary also qualifies. See *id.*, at 195.

Compared to burglary, the elements of intentional vehicular flight describe conduct that ordinarily poses greater potential risk. Although interruption and confrontation are quite rare for burglary, *every* §3(a)(3) flight is committed in the presence of a police officer. *Every* §3(a)(3) flight also involves a perpetrator acting in knowing defiance of an officer's direct order to stop, "which is a clear challenge to the officer's authority and typically initiates pursuit." *United States* v. *Harrimon*, 568 F. 3d 531, 535 (CA5 2009); see also *United States* v. *Spells*, 537 F. 3d 743, 752 (CA7 2008) ("Taking flight calls the officer to give chase, and aside from any accompanying risk to pedestrians and other motorists, such flight dares the officer to needlessly endanger himself in pursuit"). Finally, in *every* §3(b)(1)(A) flight, the perpetrator is armed with what can be a deadly weapon: a vehicle. See, *e.g.*, *Scott* v. *Harris*, 550 U. S. 372, 383 (2007) (noting that "the threat posed by the flight on foot of an unarmed suspect" was not "even remotely comparable to the extreme danger to human life" posed by that vehicular chase); *United States* v. *Kendrick*, 423 F. 3d 803, 809 (CA8 2005) ("[T]he dangerous circumstances surrounding a person's attempt to flee from law enforcement are compounded by the person's operation of a motor vehicle"); *United States* v. *Aceves-Rosales*, 832 F. 2d 1155, 1157 (CA9 1987) *(per curiam)* ("It is indisputable that an automobile . . . can be used as a deadly weapon").

In sum, every violation of §3(b)(1)(A) involves a defiant

suspect with a dangerous weapon committing a felony in front of a police officer. Based on its elements, the potential risk of intentional vehicular flight resembles "armed burglary in the presence of a security guard" more than simple burglary. Section 3(b)(1)(A) outlaws conduct with much more risk—a far greater likelihood of confrontation with police and a greater chance of violence in that confrontation—than burglary. It follows that the "the conduct encompassed by the elements of the offense, in the ordinary case," poses a greater risk of harm than the enumerated offense of burglary. *James*, *supra*, at 208.

B

Common experience and statistical evidence confirm the "potential risk" of intentional vehicular flight. Cf. *Chambers* v. *United States*, 555 U. S. 122, 129 (2009) (statistical evidence, though not always necessary, "strongly supports the intuitive belief that failure to report does not involve a serious potential risk of physical injury"). Data from the National Highway Traffic Safety Administration shows that approximately 100 police officers, pedestrians, and occupants of other cars are killed each year in chase-related crashes. National Center for Statistics & Analysis, Fatalities in Motor Vehicle Traffic Crashes Involving Police in Pursuit 37–56 (2010) (reporting 1,269 such deaths between 2000 and 2009).

The number injured must be much higher. Many thousands of police chases occur every year. In California and Pennsylvania, which collect statewide pursuit data, police were involved in a combined total of more than 8,700 chases in 2007 alone. See Pennsylvania State Police Bureau of Research & Development, Police Pursuits 2007 Annual Report; Report to the Legislature, Senate Bill 719, California Police Pursuits (March 2008); see also Schultz, Hudak, & Alpert, Emergency Driving and Pursuits, FBI Law Enforcement Bulletin, Apr. 2009, pp. 1, 4 (surveying

more than 2,100 police officers and finding an average of just over one pursuit per officer each year). And up to 41% of all chases involve a crash, which always carries some risk of injury. Wells & Falcone, Research on Police Pursuits: Advantages of Multiple Data Collection Strategies, 20 Policing: Int'l J. Police Strategies & Management 729, 740 (1997) (citing nine studies, each showing a crash rate between 18% and 41%). Indeed, studies show that 4% to 17% of all chases actually cause injury. *Ibid.;* see also C. Lum & G. Fachner, Police Pursuits in an Age of Innovation and Reform 57 (2008) (finding that 23.5% of flights involve a crash, and 9% of flights cause injury).

An International Association of Chiefs of Police study of 7,737 pursuits across 30 States found 900 injuries, of which 313 were to police or bystanders. *Ibid.* As the majority observes, that injury rate is just over 4 injuries per 100 chases, *excluding* injuries to the perpetrator. *Ante*, at 8. By comparison, the injury rate for burglary and arson is around 3 injuries per 100 crimes, or less. *Ante*, at 9; see also *Harrimon*, *supra,* at 537 (citing similar arson statistics, showing between 1 and 3 injuries per 100 fires, apparently including injuries to perpetrators). Statistics support what logic suggests: The ordinary case of intentional vehicular flight is risky, indeed, more so than some offenses listed in ACCA.

These statistical risks of intentional flight merely reinforce common sense and real world experience. See, *e.g.,* Carroll & Woomer, Family Killed in Visalia Crash After Man Flees From Sheriff's Deputy, Visalia Times-Delta, Apr. 2–3, 2011, p. 1A; Broward & Butler, Fleeing Car Hits Another; 5 People Injured, Florida Times-Union, Mar. 15, 2011, p. C2; Klopott, Crash During Police Chase Kills Father of Four, Washington Examiner, Nov. 22, 2010, p. 4; Fenton, Woman Killed During Pursuit Identified, Baltimore Sun, July 27, 2010, p. 4A (reporting that a woman was killed when a fleeing suspect crashed into her car);

Rein & Hohmann, Crashes, Injuries Left in Wake of Pr. George's-Baltimore Chase, Washington Post, Nov. 22, 2009, p. C3 (noting injuries to two police officers and an innocent motorist).

Also well known are the lawsuits that result from these chases. See, *e.g.,* Bowes, Claim Settled in Death of Officer, Richmond Times-Dispatch, Mar. 28, 2007, p. B1 ($2.35 million settlement for the family of an off-duty police officer killed in a head-on collision with a police car chasing a suspect); Cuculiansky, Stop-Stick Death Suit Settled, Daytona Beach News-Journal, Aug. 4, 2010, p. 1C ($100,000 settlement for the family of a man killed by a fleeing vehicle); Ostendorff, Woman Sues City Police, Asheville Citizen-Times, June 17, 2010, p. A1 (woman sued police after they fired 10 shots into the fleeing car she was riding in, wounding her); Gates, $375,000 Awarded in Crash Lawsuit*,* Jackson, Miss., Clarion-Ledger, May 9, 2010, p. 1B (noting four police-chase lawsuits won against the city in a single year and describing an opinion awarding $375,000 to an injured third-party); Pallasch, $17.5 Million Awarded to Motorist Disabled in Police Chase, Chicago Sun Times, Mar. 23, 2005, p. 18. In the real world, everyone—police, citizens, and suspects who elect to flee—knows that vehicular flight is dangerous.

## C

Convictions under §3(b)(1)(A) further support this conclusion. See, *e.g.*, *Mason* v. *State*, 944 N. E. 2d 68, 69–70 (Ind. App. 2011) (defendant suddenly drove his car toward police officers, who then fired at him; he crashed into other cars and was Tasered); *Jones* v. *State*, 938 N. E. 2d 1248, 1253 (Ind. App. 2010) (defendant accelerated and crashed into a police car); *Haney* v. *State*, 920 N. E. 2d 818, 2010 WL 305813, *1 (Ind. App., Jan. 27, 2010) (defendant, who had been speeding, drove into a yard, between two houses,

and then into a field where he crashed into a tree); *Hape* v. *State*, 903 N. E. 2d 977, 984, 985, n. 4, 994 (Ind. App. 2009) (defendant fled for 40 minutes, at times in excess of 100 mph and into oncoming traffic; police fired at his truck at least 20 times; he was captured only after driving into a flooded area); *Smith* v. *State*, 908 N. E. 2d 1280, 2009 WL 1766526, *1 (Ind. App., June 23, 2009) (defendant led police on a stop-and-go chase for five minutes, which included traveling at 30 mph through a stop sign and crowded parking lot; he ultimately had to be chemical sprayed); *Butler* v. *State*, 912 N. E. 2d 449, 2009 WL 2706123, *1 (Ind. App., Aug. 28, 2009) (defendant led a chase at speeds up to 80 mph, swerved into the path of an oncoming vehicle, and eventually jumped from the car while it was still moving); *Amore* v. *State*, 884 N. E. 2d 434, 2008 WL 1032611, *1 (Ind. App., Apr. 11, 2008) (defendant led police on a 15-mile chase at speeds up to 125 mph, ending in a crash); *Johnson* v. *State*, 879 N. E. 2d 24, 2008 WL 131195, *1 (Ind. App., Jan. 14, 2008) (defendant led a chase at 65–70 mph at 1 a.m. with no tail lights, crashed his car, and caused a police car to crash); *Tinder* v. *State*, 881 N. E. 2d 735, 2008 WL 540772, *1, *3 (Ind. App., Feb. 29, 2008) (rev'g on other grounds) (defendant led a 12:30 a.m. chase, which ended when he ran off the road, crashed through a corn silo, and hit a fence). Although these cases are only a limited collection, their facts illustrate that convictions under §3(b)(1)(A) often involve highly dangerous conduct.

## II

Sykes argues that intentional vehicular flight is not a violent felony for two main reasons. First, he asserts that it is possible to violate Indiana's intentional vehicular flight statute without doing anything dangerous. Second, he urges that the existence of Ind. Code §35–44–3–3(b)(1)(B), which includes "substantial risk" as an addi-

tional element, indicates that §3(b)(1)(A) is nonrisky. Neither argument is persuasive.

### A

Sykes observes that it would violate the statute to flee at low speed, obeying traffic signs and stopping after only a short distance. See *Woodward* v. *State*, 770 N. E. 2d 897, 900–901 (Ind. App. 2002); *post*, at 4 (KAGAN, J., dissenting). Such a flight, he urges, would not present "a serious potential risk of physical injury to another," so a conviction under the statute cannot categorically be a violent felony.

The fact that Sykes can imagine a nonrisky way to violate §3(b)(1)(A) does not disprove that intentional vehicular flight is dangerous "in the ordinary case." See *James*, 550 U. S., at 208. It is also possible to imagine committing burglary—an enumerated offense—under circumstances that pose virtually no risk of physical injury. See *id.*, at 207 (hypothesizing a "break-in of an unoccupied structure located far off the beaten path and away from any potential intervenors").

Nor has Sykes established that the nonrisky scenario he imagines is the ordinary violation of §3(b)(1)(A). Sykes offers nothing more than two Indiana cases that, in his view, are instances of nonrisky vehicular flight. See *Swain* v. *State*, 923 N. E. 2d 32, 2010 WL 623720 (Ind. App., Feb. 23, 2010); *Woodward*, *supra,* at 898. Yet not even those cases obviously involve nonrisky conduct. In *Swain*, the defendant was a getaway driver who picked up her boyfriend's accomplice as he ran on foot from two police officers. 2010 WL 623720, *1, *3. As the officers approached the car and shouted to stop, she yelled, "'Hurry up. Come on. They're coming,'" and drove off as the runner jumped in. *Id.*, at *1. She stopped 10 to 15 seconds later, when police vehicles converging on the scene took up pursuit. *Ibid.* In *Woodward*, the defendant

ignored a police siren for approximately a mile, passed several good places to pull over, and drove all the way home, but traveled at the speed limit of 45 mph and obeyed traffic laws. 770 N. E. 2d, at 898. Eventually the defendant got out of his car and shouted profanities at the officer, who drew his pistol. *Id.,* at 898, 901; see also *id.,* at 901, 902 (observing that the defendant had refused to stop "except on his own terms" and noting "the dangers that could await a police officer stopping where the citizen selects"). These two cases fall well short of showing that intentional flight in Indiana is ordinarily nonrisky.[1] See also *post*, at 6 (KAGAN, J., dissenting) (noting that the "intuition that dangerous flights outstrip mere failures to stop . . . seems consistent with common sense and experience").

## B

Sykes also notes that a different subparagraph, §3(b)(1)(B), covers intentional flight committed while "operat[ing] a vehicle in a manner that creates a substantial risk of bodily injury to another person," whereas §3(b)(1)(A) has no such element. From this, Sykes infers that §3(b)(1)(A) necessarily concerns only flight that does not present a serious potential risk. The argument is that, even though the elements of §3(b)(1)(A) describe conduct that ordinarily will satisfy the requisite level of risk, the presence of §3(b)(1)(B) casts §3(b)(1)(A) in a less dangerous light. *Post*, at 8 (KAGAN, J., dissenting). But the fact that §3(b)(1)(B) includes "substantial risk of bodily injury" as an element does not restrict §3(b)(1)(A) to nonrisky

―――――――

[1] Sykes certainly cannot use his own flight as an example. His §3(b)(1)(A) conviction was based on fleeing from police in a damaged car at night without headlights, driving on the wrong side of the road, weaving through traffic, barreling through two yards and among bystanders, destroying a fence, and crashing into a house. *Ante*, at 4; 2 App. 11 (Sealed).

conduct.

First, apart from the existence of §3(b)(1)(B), the absence of risk as an element of §3(b)(1)(A) does not mean that the offense is not a violent felony. ACCA does not require that a violent felony expressly include a risk of injury as an element of the offense. Enumerated violent felonies like arson and burglary have no such element.

Second, §3(b)(1)(B) is not a risky, aggravated version of §3(b)(1)(A). Both are class D felonies, and at the time of Sykes' conviction, there was no statutory difference in punishment between them. Even now, the offenses remain of a single class, meriting similar punishments.

The similarity in punishment for these related, overlapping offenses suggests that §3(b)(1)(A) is the rough equivalent of one type of §3(b)(1)(B) violation. Section 3(b)(1)(B) enhances punishments for three separate types of intentional misdemeanors: obstructing an officer, §3(a)(1); interfering with service of process, §3(a)(2); and fleeing from a police officer, §3(a)(3). Under §3(b)(1)(B), committing any of those offenses while also drawing a deadly weapon, inflicting injury, or "operat[ing] a vehicle in a manner that creates a substantial risk of bodily injury to another person" has long been a class D felony.

In 1998, the Indiana Legislature added §3(b)(1)(A) to provide that *any* use of a vehicle to flee from an officer under §3(a)(3) is *always* a class D felony. Section 3(b)(1)(A) is, in effect, a shortcut to the same punishment for one particular violation of §3(b)(1)(B).[2] It is still the

––––––––
[2] Indiana law at the time of Sykes' conviction presented two related provisions, within a single statute, carrying the same punishment. One was a broad provision that had risk as an element, and the other was a narrower provision that did not. While Justice Kagan would infer that the offense lacking risk as an element was likely not ordinarily risky, *post*, at 6–8, I think it makes more sense to infer the opposite.

Consider reckless endangerment statutes. In Hawaii, for instance, it is "reckless endangering in the second degree" either to "recklessly

case that under §3(b)(1)(B), using a vehicle to obstruct an officer or interfere with service of process is a class D felony only if the vehicle is "operate[d] . . . in a manner that creates a substantial risk of bodily injury to another person." §3(b)(1)(B). But using a vehicle to intentionally flee is always a class D felony, without any need to prove risk. §3(b)(1)(A).

This rough equivalence between §3(b)(1)(A) and §3(b)(1)(B) is borne out in Indiana case law. The conduct underlying the Indiana cases discussed above, see *supra*, at 6–7, demonstrates that despite §3(b)(1)(B), convictions under §3(b)(1)(A) include risky flights.

Third, the remainder of Indiana's resisting law enforce-

_____

plac[e] another person in danger of death or serious bodily injury," Haw. Rev. Stat. §707–714(1)(a) (2009 Cum. Supp.), *or* to "[i]ntentionally discharg[e] a firearm in a populated area," §707–714(1)(b). I would infer that discharging the firearm is deemed dangerous enough *per se* that the statute does not require the State to prove danger in any given case. Other States have similar statutes. See, *e.g.*, Del. Code Ann., Tit. 11, §§603(a)(1), (2) (2007); Wyo. Stat. Ann. §§6–2–504(a), (b) (2009); Me. Rev. Stat. Ann., Tit. 17–A, §§301(1)(B)(1), (2) (Supp. 2010).

Similarly here, I infer that §3(b)(1)(A)'s upgrade of intentional flight to a class D felony based on the use of a vehicle alone indicates that the offense *inherently* qualifies as, or approximates, "operat[ing] a vehicle in a manner that creates a substantial risk of bodily injury to another person" under §3(b)(1)(B).

JUSTICE KAGAN argues that if my reading were correct, the Indiana Legislature would have removed the reference to vehicular flight from §3(b)(1)(B) when it added §3(b)(1)(A). *Post*, at 12. There are at least two problems with this reasoning. First, even though §3(b)(1)(A) may be redundant with §3(b)(1)(B) as to the vehicular flight offenses in subsection (a)(3), the reference to "operat[ing] a vehicle" in §3(b)(1)(B) is still independently useful for the offenses in subsections (a)(1) and (2). Thus, it is hardly strange for the legislature to have left the reference to "operat[ing] a vehicle" in §3(b)(1)(B). Second, although JUSTICE KAGAN can envision a more perfectly drafted statute, we do not require perfection in statutory drafting. See, *e.g., Bruesewitz* v. *Wyeth LLC*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 12). I think it clear enough what the statute means.

ment statute confirms that its other provisions do not reserve §3(b)(1)(A) for nonrisky conduct. An intentional vehicular flight becomes a class C felony if the vehicle is operated "in a manner that causes serious bodily injury." Ind. Code §35–44–3–3(b)(2). The same act becomes a class B felony if someone is killed. §35–44–3–3(b)(3).[3] JUSTICE KAGAN asserts that each of these "separate, escalating crimes" captures an increasing degree of risk and necessarily means that §3(b)(1)(A), the offense *simpliciter*, is less risky than it otherwise seems. *Post*, at 7.

The flaw in this reasoning is that §§3(b)(2) and (3) enhance punishment based solely on the *results* of the flight, not the degree of risk it posed. Neither provision requires any action by a suspect beyond that which satisfies the elements of §3(b)(1)(A).[4] Rather, each provision addresses what happens when the risk inherent in a violation of §3(b)(1)(A) is actualized and someone is hurt or killed. The risk of physical injury inherent in intentional vehicular flight *simpliciter* was apparently clear enough to spur the Indiana Legislature to specify greater penalties for the inevitable occasions when physical injury actually occurs. By comparison, for obviously nonrisky felonies like insurance fraud or misappropriation of escrow funds, legislatures do not specify what additional punishment is warranted when the crime kills or injures bystanders or police. See, *e.g.*, Ind. Code §35–43–5–7.2; §35–43–9–7. In sum, §§3(b)(2) and (3) do not demonstrate that §3(b)(1)(A) is less risky than it otherwise seems, but instead support the idea that it is inherently risky.

_____

[3] Indiana recently added that if a police officer dies, it becomes a class A felony. 2010 Ind. Acts p. 1197.

[4] For that matter, each provision also could be satisfied by a flight that did not satisfy §3(b)(1)(B), which casts further doubt on JUSTICE KAGAN's vision of the statutory scheme as a unified structure of neatly progressing offenses with corresponding risk levels and punishments. See *post*, at 7.

THOMAS, J., concurring in judgment

\*   \*   \*

Looking to the elements, statistics, common experience, and cases, I conclude that in the ordinary case, Indiana's crime of intentional vehicular flight, §3(b)(1)(A), "involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B)(ii).  The crime is therefore a violent felony under ACCA.

# SUPREME COURT OF THE UNITED STATES

No. 09–11311

MARCUS SYKES, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 9, 2011]

JUSTICE SCALIA, dissenting.

As the Court's opinion acknowledges, this case is "another in a series," *ante*, at 1. More specifically, it is an attempt to clarify, for the fourth time since 2007, what distinguishes "violent felonies" under the residual clause of the Armed Career Criminal Act (ACCA), 18 U. S. C. §924(e)(2)(B)(ii), from other crimes. See *James* v. *United States*, 550 U. S. 192 (2007); *Begay* v. *United States*, 553 U. S. 137 (2008); *Chambers* v. *United States*, 555 U. S. 122 (2009). We try to include an ACCA residual-clause case in about every second or third volume of the United States Reports.

As was perhaps predictable, instead of producing a clarification of the Delphic residual clause, today's opinion produces a fourth ad hoc judgment that will sow further confusion. Insanity, it has been said, is doing the same thing over and over again, but expecting different results. Four times is enough. We should admit that ACCA's residual provision is a drafting failure and declare it void for vagueness. See *Kolender* v. *Lawson*, 461 U. S. 352, 357 (1983).

I

ACCA defines "violent felony," in relevant part, as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . is burglary, arson, or extortion, in-

volves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B)(ii). Many years of prison hinge on whether a crime falls within this definition. A felon convicted of possessing a firearm who has three prior violent-felony convictions faces a 15-year mandatory minimum sentence and the possibility of life imprisonment. See §924(e)(1); see *United States* v. *Harrison*, 558 F. 3d 1280, 1282, n. 1 (CA11 2009). Without those prior convictions, he would face a much lesser sentence, which could not possibly exceed 10 years. See §924(a)(2).

Vehicular flight is a violent felony only if it falls within ACCA's residual clause; that is, if it "involves conduct that presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii). Today's opinion says, or initially seems to say, that an offense qualifies as a violent felony if its elements, in the typical case, create a degree of risk "'comparable to that posed by its closest analog among the enumerated offenses.'" *Ante*, at 6. That is a quotation from the Court's opinion in the first of our residual-clause trilogy, *James*, 550 U. S., at 203. I did not join that opinion because I thought it should suffice if the elements created a degree of risk comparable to the least risky of the enumerated offenses, whether or not it was the closest analog. See *id.*, at 230 (SCALIA, J., dissenting). The problem with applying the *James* standard to the present case is that the elements of vehicular flight under Indiana law are not analogous to *any* of the four enumerated offenses. See Ind. Code §35–44–3–3 (2004). Nor is it apparent which of the enumerated offenses most closely resembles, for example, statutory rape, see *United States* v. *Daye*, 571 F. 3d 225, 228–236 (CA2 2009); possession of a sawed-off shotgun, see *United States* v. *Upton*, 512 F. 3d 394, 403–405 (CA7 2008); or a failure to report to prison, see *Chambers, supra.* I predicted this inadequacy of the "closest analog" test in my *James* dissent. See 550 U. S.,

at 215.

But as it turns out, the Court's inability to identify an analog makes no difference to the outcome of the present case. For today's opinion introduces the *James* standard with the words "[f]or instance," *ante*, at 6. It is (according to the Court) merely *one example* of how the enumerated crimes (burglary, arson, extortion, and crimes using explosives) "provide guidance." *Ibid.* And the opinion then proceeds to obtain guidance from the risky-as-the-least-risky test that I suggested (but the Court rejected) in *James*—finding vehicular flight at least as risky as both arson and burglary. See *ante*, at 6–9.

But what about the test that determined the outcome in our second case in this "series"—the "purposeful, violent, and aggressive" test of *Begay?* Fear not. That incompatible variation has been neither overlooked nor renounced in today's tutti-frutti opinion. "In many cases," we are told, it "will be redundant with the inquiry into risk." *Ante*, at 11. That seems to be the case here—though why, and when it will *not* be the case, are not entirely clear. The Court's accusation that Sykes "overreads the opinions of this Court," *ante*, at 10, apparently applies to his interpretation of *Begay*'s "purposeful, violent, and aggressive" test, which the Court now suggests applies only "to strict liability, negligence, and recklessness crimes," *ante*, at 11. But that makes no sense. If the test excluded only those unintentional crimes, it would be recast as the "purposeful" test, since the last two adjectives ("violent, and aggressive") would do no work. For that reason, perhaps, all 11 Circuits that have addressed *Begay* "overrea[d]" it just as Sykes does*—and as does the Government, see Brief for

——————

*See *United States* v. *Holloway*, 630 F. 3d 252, 260 (CA1 2011); *United States* v. *Brown*, 629 F. 3d 290, 295–296 (CA2 2011) *(per curiam); United States* v. *Lee*, 612 F. 3d 170, 196 (CA3 2010); *United States* v. *Jenkins*, 631 F. 3d 680, 683 (CA4 2011); *United States* v. *Harrimon*, 568 F. 3d 531, 534 (CA5 2009); *United States* v. *Young*, 580

United States 8.

The only case that is not brought forward in today's opinion to represent yet another test is the third and most recent in the trilogy, *Chambers*, 555 U. S. 122—which applied both the risky-as-the-least-risky test and the "purposeful, violent, and aggressive" test to reach the conclusion that failure to report for periodic incarceration was not a crime of violence under ACCA. But today's opinion does cite *Chambers* for another point: Whereas *James* rejected the risky-as-the-least-risky approach because, among other reasons, no "hard statistics" on riskiness "have been called to our attention," 550 U. S., at 210; and whereas *Begay* made no mention of statistics; *Chambers* explained (as today's opinion points out) that "statistical evidence sometimes 'helps provide a conclusive . . . answer' concerning the risks that crimes present," *ante*, at 8 (quoting *Chambers*, *supra*, at 129). Today's opinion then outdoes *Chambers* in the volume of statistics that it spews forth—statistics compiled by the International Association of Chiefs of Police concerning injuries attributable to police pursuits, *ante*, at 8; statistics from the Department of Justice concerning injuries attributable to burglaries, *ante*, at 9; statistics from the U. S. Fire Administration concerning injuries attributable to fires, *ibid.*, and (by reference to JUSTICE THOMAS's concurrence) statistics from the National Center for Statistics & Analysis, the Pennsylvania State Police Bureau of Research, the FBI Law Enforcement Bulletin and several articles published elsewhere concerning injuries attributable to police pursuits, *ante*, at 8 (citing *ante*, at 4–5 (THOMAS, J., concurring in judgment)).

––––––––––

F. 3d 373, 377 (CA6 2009); *United States* v. *Sonnenberg*, 628 F. 3d 361, 364 (CA7 2010); *United States* v. *Boyce*, 633 F. 3d 708, 711 (CA8 2011); *United States* v. *Terrell*, 593 F. 3d 1084, 1089–1091 (CA9 2010); *United States* v. *Ford*, 613 F. 3d 1263, 1272–1273 (CA10 2010); *United States* v. *Harrison*, 558 F. 3d 1280, 1295–1296 (CA11 2009).

Supreme Court briefs are an inappropriate place to develop the key facts in a case. We normally give parties more robust protection, leaving important factual questions to district courts and juries aided by expert witnesses and the procedural protections of discovery. See Fed. Rule Crim. Proc. 16(a)(1)(F), (G); Fed. Rules Evid. 702–703, 705. An adversarial process in the trial courts can identify flaws in the methodology of the studies that the parties put forward; here, we accept the studies' findings on faith, without examining their methodology at all. The Court does not examine, for example, whether the police-pursuit data on which it relies is a representative sample of all vehicular flights. The data may be skewed towards the rare and riskier forms of flight. See *post*, at 6, n. 4 (KAGAN, J., dissenting). We also have no way of knowing how many injuries reported in that data would have occurred even absent pursuit, by a driver who was driving recklessly even before the police gave chase. Similar questions undermine confidence in the burglary and arson data the Court cites. For example, the Court relies on a U. S. Fire Administration dataset to conclude that 3.3 injuries occur per 100 arsons. See *ante*, at 9. But a 2001 report from the same U. S. Fire Administration suggests that roughly 1 injury occurs per 100 arsons. See Arson in the United States, Vol. 1 Topical Fire Research Series, No. 8, pp. 1–2 (rev. Dec. 2001), online at http://www.usfa.dhs.gov/downloads/pdf/tfrs/v1i8-508.pdf (as visited May 27, 2011, and available in Clerk of Court's case file). The Court does not reveal why it chose one dataset over another. In sum, our statistical analysis in ACCA cases is untested judicial factfinding masquerading as statutory interpretation. Most of the statistics on which the Court relies today come from government-funded studies, and did not make an appearance in this litigation until the Government's merits brief to this Court. See Brief for Petitioner 17; see also *Chambers*,

*supra*, at 128–129 (demonstrating that the same was true in that case).

But the more fundamental problem with the Court's use of statistics is that, far from eliminating the vagueness of the residual clause, it increases the vagueness. Vagueness, of course, must be measured *ex ante—before* the Court gives definitive meaning to a statutory provision, not *after*. Nothing is vague once the Court decrees precisely what it means. And is it seriously to be expected that the average citizen would be familiar with the sundry statistical studies showing (if they are to be believed) that this-or-that crime is more likely to lead to physical injury than what sundry statistical studies (if they are to be believed) show to be the case for burglary, arson, extortion, or use of explosives? To ask the question is to answer it. A few words, then, about unconstitutional vagueness.

## II

When I dissented from the Court's judgment in *James*, I said that the residual clause's "shoddy draftsmanship" put courts to a difficult choice:

> "They can (1) apply the ACCA enhancement to virtually all predicate offenses, . . . ; (2) apply it case by case in its pristine abstraction, finding it applicable whenever the particular sentencing judge (or the particular reviewing panel) believes there is a 'serious potential risk of physical injury to another' (whatever that means); (3) try to figure out a coherent way of interpreting the statute so that it applies in a relatively predictable and administrable fashion to a smaller subset of crimes; or (4) recognize the statute for the drafting failure it is and hold it void for vagueness . . . ." 550 U. S., at 229–230.

My dissent "tried to implement," *id.*, at 230, the third option; and the Court, I believed, had chosen the second.

"Today's opinion," I wrote, "permits an unintelligible criminal statute to survive uncorrected, unguided, and unexplained." *Id.,* at 230–231.

My assessment has not been changed by the Court's later decisions in the ACCA "series." Today's opinion, which adds to the "closest analog" test *(James)* the "purposeful, violent, and aggressive" test *(Begay)*, and even the risky-as-the-least-risky test that I had proposed as the exclusive criterion, has not made the statute's application clear and predictable. And all of them together—or even the risky-as-the-least-risky test alone, I am now convinced—never will. The residual-clause series will be endless, and we will be doing ad hoc application of ACCA to the vast variety of state criminal offenses until the cows come home.

That does not violate the Constitution. What does violate the Constitution is approving the enforcement of a sentencing statute that does not "give a person of ordinarily intelligence fair notice" of its reach, *United States* v. *Batchelder*, 442 U. S. 114, 123 (1979) (internal quotation marks omitted), and that permits, indeed invites, arbitrary enforcement, see *Kolender*, 461 U. S., at 357. The Court's ever-evolving interpretation of the residual clause will keep defendants and judges guessing for years to come. The reality is that the phrase "otherwise involves conduct that presents a serious potential risk of physical injury to another" does not clearly define the crimes that will subject defendants to the greatly increased ACCA penalties. It is not the job of this Court to impose a clarity which the text itself does not honestly contain. And even if that were our job, the further reality is that we have by now demonstrated our inability to accomplish the task.

We have, I recognize, upheld hopelessly vague criminal statutes in the past—indeed, in the recent past. See, *e.g., Skilling* v. *United States*, 561 U. S. \_\_\_ (2010). That is regrettable, see *id.*, at \_\_\_ (SCALIA, J., concurring in part

and concurring in judgment) (slip op., at 1). What sets ACCA apart from those statutes—and what confirms its incurable vagueness—is our repeated inability to craft a principled test out of the statutory text. We have demonstrated by our opinions that the clause is too vague to yield "an intelligible principle," *ante*, at 13, each attempt to ignore that reality producing a new regime that is less predictable and more arbitrary than the last. ACCA's residual clause fails to speak with the clarity that criminal proscriptions require. See *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89–90 (1921).

The Court believes that the residual clause cannot be unconstitutionally vague because other criminal prohibitions also refer to the degree of risk posed by a defendant's conduct. See *ante*, at 14. Even apart from the fact that our opinions dealing with those statutes have not displayed the confusion evident in our four ACCA efforts, this is not the first time I have found the comparison unpersuasive:

> "None of the provisions the Court cites . . . is similar in the crucial relevant respect: None prefaces its judicially-to-be-determined requirement of risk of physical injury with the word 'otherwise,' preceded by four confusing examples that have little in common with respect to the supposedly defining characteristic. The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so." *James*, 550 U. S., at 230, n. 7.

Of course even if the cited statutes were comparable, repetition of constitutional error does not produce constitutional truth.

\*  \*  \*

We face a Congress that puts forth an ever-increasing volume of laws in general, and of criminal laws in particular. It should be no surprise that as the volume increases, so do the number of imprecise laws. And no surprise that our indulgence of imprecisions that violate the Constitution encourages imprecisions that violate the Constitution. Fuzzy, leave-the-details-to-be-sorted-out-by-the-courts legislation is attractive to the Congressman who wants credit for addressing a national problem but does not have the time (or perhaps the votes) to grapple with the nitty-gritty. In the field of criminal law, at least, it is time to call a halt. I do not think it would be a radical step—indeed, I think it would be highly responsible—to limit ACCA to the named violent crimes. Congress can quickly add what it wishes. Because the majority prefers to let vagueness reign, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–11311

_____

## MARCUS SYKES, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 9, 2011]

JUSTICE KAGAN, with whom JUSTICE GINSBURG joins, dissenting.

Vehicular flight comes in different varieties, and so too the statutes that criminalize the conduct. A person may attempt to outrun police officers by driving recklessly and at high speed, in disregard of traffic laws and with disdain for others' safety. Or a person may fail to heed an officer's command to pull over, but otherwise drive in a lawful manner, perhaps just trying to find a better place to stop. In Indiana, as in most States, both of these individuals are lawbreakers. But in Indiana, again as in most States, the law takes account of the differences between them, by distinguishing simple from aggravated forms of vehicular flight. Unlike the Court, I would attend to these distinctions when deciding which of Indiana's several vehicular flight crimes count as "violent felon[ies]" under the Armed Career Criminal Act (ACCA), 18 U. S. C. §924(e)(2)(B). Because petitioner Marcus Sykes was convicted only of simple vehicular flight, and not of any flight offense involving aggressive or dangerous activity, I would find that he did not commit a "violent felony" under ACCA.

## I

As the Court relates, we must decide whether the crime of which Sykes was convicted falls within ACCA's "residual clause." See *ante*, at 5–6. To do so, the crime must

"presen[t] a serious potential risk of physical injury to another," §924(e)(2)(B)(ii), and involve conduct that is "purposeful, violent, and aggressive," *Begay* v. *United States*, 553 U. S. 137, 145 (2008).[1]  Because we use the "categorical approach," we do not concern ourselves with Sykes's own conduct.  See *Taylor* v. *United States*, 495 U. S. 575, 602 (1990).  Nor do we proceed by exploring whether some platonic form of an offense—here, some abstract notion of vehicular flight—satisfies ACCA's residual clause.  We instead focus on the elements of the actual state statute at issue.  Cf. *Chambers* v. *United States*, 555 U. S. 122, 126–127 (2009) (breaking down an Illinois statute into discrete offenses to decide whether the crime of conviction fit within the residual clause); *James* v. *United States*, 550 U. S. 192, 202 (2007) (examining how Florida's law defined attempted burglary to determine if the residual clause included that offense).  More particularly, we ask whether "the conduct encompassed by the elements" of that statute, "in the ordinary case" (not in every conceivable case), involves the requisite danger and violence.  *Id.*, at 208.  By making this inquiry, we attempt

---

[1] I understand the majority to retain the "purposeful, violent, and aggressive" test, but to conclude that it is "redundant" in this case.  See *ante*, at 11.  Like JUSTICE SCALIA, see *ante*, at 3 (dissenting opinion), I find this conclusion puzzling.  I do not think the majority could mean to limit the test to "strict liability, negligence, and recklessness crimes." *Ante*, at 11 (majority opinion).  As JUSTICE SCALIA notes, see *ante*, at 3, that would be to eliminate the test's focus on "violence" and "aggression."  And it would collide with *Chambers* v. *United States,* 555 U. S. 122 (2009)—a decision the majority cites approvingly, see *ante*, at 8— which applied the test to an intentional crime.  See 555 U. S., at 128 (opinion of the Court), 130 (Appendix A to opinion of the Court) (holding that "knowin[g] fail[ure] to report to a penal institution" does not involve "purposeful, violent, or aggressive conduct" (internal quotation marks omitted)).  So I assume this test will make a resurgence—that it will be declared non-redundant—the next time the Court considers a crime, whether intentional or not, that involves risk of injury but not aggression or violence.

to determine whether the crime involved is "characteristic of the armed career criminal"—or otherwise said, whether the prohibited conduct is of a kind that "makes more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim." *Begay*, 553 U. S., at 145 (internal quotation marks omitted).

Under this approach, some vehicular flight offenses should count as violent felonies under ACCA. Consider, for example, a statute that makes it a crime to "willfully flee from a law enforcement officer by driving at high speed or otherwise demonstrating reckless disregard for the safety of others." Such a statute, by its terms, encompasses conduct that ordinarily "presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii). And the covered conduct qualifies as "purposeful, violent, and aggressive." *Id.,* at 145. When a motorist responds to an officer's signal to stop by increasing his speed or taking reckless evasive action, he turns his car into a weapon and provokes confrontation. In so doing, he engages in behavior "roughly similar, in kind as well as in degree of risk posed," to that involved in ACCA's enumerated offenses—the sort of conduct, in other words, "typically committed by . . . 'armed career criminals.'" *Id.*, at 143, 146. Like the majority, see *ante*, at 9–10, I therefore would classify crimes of this type—call them aggravated vehicular flight offenses—as violent felonies under ACCA.

But a vehicular flight offense need not target aggressive and dangerous behavior. Imagine the converse of the statute described above—a statute making it a crime to "willfully flee from a law enforcement officer *without* driving at high speed or otherwise demonstrating reckless disregard for the safety of others." That hypothetical statute addresses only simple vehicular flight: mere disregard of a police officer's directive to stop, devoid of additional conduct creating risk to others. This behavior—often called "failure to stop"—is illegal in most States

(under a wide variety of statutory provisions). In Indiana, for example, a driver who "know[s] that a police officer wishes to effectuate a traffic stop" may commit a felony if he attempts to "choose the location of the stop," rather than pulling over immediately; it makes no difference that the driver "did not speed or disobey any . . . traffic laws." *Woodward* v. *State,* 770 N. E. 2d 897, 902 (Ind. App. 2002).[2] But a mere failure to stop does not usually "presen[t] a serious potential risk of physical injury to another," §924(e)(2)(B)(ii), any more than normal driving does. Nor is this conduct "violent . . . and aggressive." *Begay*, 553 U. S., at 145; see Brief for United States 43 (characterizing as "nonviolent" a flight from police that complies with "all traffic laws"). True, the offender is ignoring a command he should obey. But nothing in his behavior is affirmatively belligerent: It does not "show an increased likelihood that [he] is the kind of person who might deliberately point the gun and pull the trigger." *Begay,* 553 U. S., at 146.[3] And so, under our precedents, a statute criminalizing *only* simple vehicular flight would not fall within ACCA's residual clause. I do not under-

_____

[2] The majority attempts to show that *Woodward* involved conduct more risky and violent than a simple failure to stop. See *ante,* at 3; see also *ante*, at 7 (THOMAS, J., concurring in judgment). But the facts of that case, like the facts of this one, are irrelevant. Under ACCA, all that matters is the elements of the offense, and the Indiana Court of Appeals held in *Woodward* that a person who "merely fail[s] to stop" for police, and does nothing more, commits a felony under state law. 770 N. E. 2d, at 900–902.

[3] Indeed, a driver may refrain from pulling over immediately out of concern for his own safety. He may worry, for example, that road conditions make it hazardous to stop. Or a driver may fear that the person initiating the stop is a criminal rather than a police officer. See, *e.g.,* Brennan, Rapist to Spend Life in Prison, Tampa Tribune, Feb. 18, 2011, Metro section, p. 3 ("[A man] impersonating a police officer . . . used the ruse to pull over a woman . . . and then kidnap and rape her"); DeKunder, Watch for "Fake" Police, Local Authorities Warn, Northeast Herald, Jan. 14, 2010, pp. 12, 13 (noting several similar incidents).

stand the majority to disagree.

The Indiana provision under which Sykes was convicted straddles the two hypothetical statutes I have just described. That provision, subsection (b)(1)(A), states that a person commits a felony if he "flees from a law enforcement officer" while "us[ing] a vehicle." Ind. Code §§35–44–3–3(a)(3), (b)(1)(A) (2009). As the Indiana courts have recognized, the subsection thus criminalizes mere failure to stop, which should not count as a violent felony under ACCA. See *Woodward,* 770 N. E. 2d 897; *supra*, at 4, and n. 2. But the provision *also* includes more violent forms of vehicular flight: It covers a person who speeds or drives recklessly, who leads the police on a "Hollywood-style car chase," *Scott* v. *Harris*, 550 U. S. 372, 380 (2007), and who endangers police officers, other drivers, and pedestrians. And so the "conduct encompassed by the elements" of this subsection, *James,* 550 U. S., at 208, runs the gamut—from simple to aggravated vehicular flight, from the least violent to the most violent form of the activity. Accord, *ante*, at 9–10 (THOMAS, J., concurring in judgment) (stating that subsection (b)(1)(A) is "not restrict[ed] . . . to nonrisky conduct"). The question presented is whether such a facially broad provision meets the requirements of ACCA's residual clause.

If subsection (b)(1)(A) were the whole of Indiana's law on vehicular flight, the majority would have a reasonable argument that the provision does so. As noted, a statute fits within the residual clause if it covers conduct that *in the ordinary case*—not in every conceivable case—poses serious risk of physical injury and is purposeful, violent, and aggressive. See *James,* 550 U. S., at 208; *Begay*, 553 U. S., at 145. We therefore must decide what the ordinary case of vehicular flight actually is. Is it the person trying to escape from police by speeding or driving recklessly, in a way that endangers others? Or is it instead the person driving normally who, for whatever reason, fails to re-

spond immediately to a police officer's signal?  The Government has not presented any empirical evidence addressing this question, and such evidence may not in fact exist.[4]  See Wells & Falcone, Research on Police Pursuits: Advantages of Multiple Data Collection Strategies, 20 Policing Int'l J. Police Strategies & Management 729 (1997) ("Collecting valid and reliable data on policing activities is a perennial problem . . . .  This is particularly true when studying . . . vehicle pursuits"); cf. *Begay,* 553 U. S., at 154 (SCALIA, J., concurring in judgment) ("Needless to say, we do not have these relevant statistics").  But the majority's intuition that dangerous flights outstrip mere failures to stop—that the aggravated form of the activity is also the ordinary form—seems consistent with common sense and experience.  So that judgment, even though unsupported by data, would likely be sufficient to justify the Court's conclusion were subsection (b)(1)(A) the only relevant provision.

But subsection (b)(1)(A) does not stand alone, and the context of the provision casts a different light on it.  Like a great many States (45 by my count), Indiana divides the

---

[4] The Government offers anecdotal examples and statistical surveys of vehicular flights, see Brief for United States 13–15, 17–22, but none helps to answer whether the "ordinary" case of vehicular flight is aggravated or simple.  Cf. *ante,* at 4–6 (SCALIA, J., dissenting).  The anecdotes and all but one of the surveys demonstrate only that some vehicular flights result in serious injury, a proposition no one does or could dispute.  The single statistical study cited by the Government that posits an injury rate for vehicular flight concludes that about 4% of 7,737 reported police pursuits harmed police or bystanders.  But that study may well involve only aggravated flights.  See C. Lum & G. Fachner, Police Pursuits in an Age of Innovation and Reform 55 (2008) (noting that the study relies on voluntary and non-systematic reporting and that participating police departments might not have reported "informal" incidents).  And even assuming the study is comprehensive, it is entirely consistent with the possibility that the "ordinary case"— *i.e.*, the most common form—of vehicular flight is mere failure to stop, which produces a much lower rate of injury.

world of vehicular flight into discrete categories, corresponding to the seriousness of the criminal behavior. At the time of Sykes's conviction, Indiana had four degrees of vehicular flight, only the first of which—subsection (b)(1)(A)—covered mere failure to stop.[5]　See Ind. Code §35–44–3–3. Indiana classified as a felon any person who:

- "flees from a law enforcement officer" while "us[ing] a vehicle," §3(b)(1)(A);
- "flees from a law enforcement officer" while "operat[ing] a vehicle in a manner that *creates a substantial risk of bodily injury* to another person," §3(b)(1)(B);[6]
- "flees from a law enforcement officer" while "operat[ing] a vehicle in a manner that *causes serious bodily injury* to another person," §3(b)(2); or
- "flees from a law enforcement officer" while "operat[ing] a vehicle in a manner that *causes the death* of another person," §3(b)(3) (all emphasis added).

Vehicular flight in Indiana is therefore not a single offense, but instead a series of separate, escalating crimes. Each category captures conduct more dangerous than the one before it, as shown by the language italicized above.[7]

---

[5] After Sykes's conviction, Indiana added yet a fifth degree. See 2010 Ind. Acts p. 1197. The four degrees described above remain unchanged.

[6] This provision also bars a range of other conduct. See n. 9, *infra*.

[7] JUSTICE THOMAS attempts to bisect this series by stating that the two most serious degrees of aggravated vehicular flight "enhance punishment based solely on the *results* of the flight, not the degree of risk it posed." *Ante,* at 11–12. But conduct that leads to serious injury or death is ordinarily more risky, viewed *ex ante*, than conduct that does not produce these results. And in any event, the fundamental point here is that the Indiana statute grades vehicular flight according to the seriousness of the behavior—ranging from flight that need not pose any risk of harm, through flight posing a substantial risk of harm, to flight involving a *certainty* of harm. Subsections (b)(2) and (b)(3)

And at the very beginning of this series is subsection (b)(1)(A), the offense of which Sykes was convicted.

That placement alters the nature of the analysis. We have previously examined the way statutory provisions relate to each other to determine whether a particular provision counts as a violent felony under ACCA. In *Chambers*, 555 U. S., at 126–127, we considered an Illinois statute prohibiting within a single section several different kinds of behavior, including escape from a penal institution and failure to report to a penal institution. The courts below had treated the statute as defining a single crime of felonious escape and held that crime to qualify as a violent felony under ACCA. See *id.,* at 125; *United States* v. *Chambers,* 473 F. 3d 724, 725–726 (CA7 2007). We disagreed, stating that failure to report was a distinct offense, which did not meet ACCA's requirements. That was so, we stated, because "[t]he behavior that likely underlies a failure to report would seem less likely to involve a risk of physical harm than the less passive, more aggressive behavior underlying an escape from custody." *Chambers,* 555 U. S., at 127. In addition, we noted, the statute "list[ed] escape and failure to report separately (in its title and its body)." *Ibid.* We thus considered the failure-to-report clause in its statutory context—as one part of a legislature's delineation of related criminal offenses—to determine whether the behavior it encompassed ordinarily poses a serious risk of injury.

That same focus on statutory structure resolves this case, because it reveals subsection (b)(1)(A) to aim at a single form—the least serious form—of vehicular flight. Remember: Indiana has made a purposeful choice to divide the full spectrum of vehicular flight into different

thus underscore that Indiana has divided the world of vehicular flight into discrete, ascending crimes, rather than treating all vehicular flight as of a piece.

degrees, based on the danger associated with a driver's conduct. Once again, starting with the most serious conduct: flight resulting in death; flight resulting in physical injury; flight creating a substantial risk of physical injury; flight. That last category—flight—almost screams to have the word "mere" placed before it. Under the Indiana statute, flight—the conduct prohibited by subsection (b)(1)(A)—is what is left over when no aggravating factor causing substantial risk or harm exists. Put on blinders, and the subsection is naturally understood to address all flight, up to and including the most dangerous kinds. But take off those blinders—view the statute as a whole—and the subsection is instead seen to target failures to stop.

In this vein, the distinction between subsections (b)(1)(A) and (b)(1)(B) is especially telling. As noted, subsection (b)(1)(B) prohibits vehicular flight that "creates a substantial risk of bodily injury to another person." That language almost precisely tracks the phrasing of ACCA's residual clause, which refers to conduct that "presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B)(ii). This correspondence indicates that the conduct criminalized under subsection (b)(1)(B) qualifies as a violent felony under ACCA. But subsection (b)(1)(A) lacks the very feature that makes subsection (b)(1)(B) and ACCA such a perfect match: It does not require any behavior that poses serious risk to others. This difference in statutory elements indicates that subsection (b)(1)(B)—but *not* subsection (b)(1)(A)—is directed toward the conduct described in ACCA's residual clause. To count *both* as ACCA offenses is to pay insufficient heed to the way the Indiana Legislature drafted its statute—as a series of escalating offenses, ranging from the simple to the most aggravated.[8]

———————

[8] None of this is to deny that prosecutors may sometimes charge violent and dangerous offenders under subsection (b)(1)(A). A prosecutor

## II

The Court does not deny that a State's decision to divide a generic form of conduct (like vehicular flight) into separate, escalating crimes may make a difference under ACCA; rather, the Court declines to address that question. See *ante*, at 13. The Court rejects the structural argument here for one, and only one, reason. Indiana, the majority says, "treats violations of subsections (b)(1)(A) and (b)(1)(B) as crimes of the same magnitude": They are both class D felonies carrying the same punishment.[9]  See also

_____

may elect to use a lower grade of vehicular flight when he could use a higher one, either as a matter of discretion or because the defendant entered into a plea bargain.  This case provides one example, see *ante*, at 4 (majority opinion), and JUSTICE THOMAS offers several others, see *ante*, at 6–7.  But as everyone agrees, what matters in determining whether an offense qualifies under ACCA's residual clause is the "ordinary case" of conviction.  And in the absence of reliable empirical evidence, the structure of the Indiana statute provides the best way to discern the ordinary case under each subsection.

[9]The Government spurns the structural argument on a different ground, contending that subsection (b)(1)(A) is not a lesser included offense of subsection (b)(1)(B).  The Court wisely does not accept this claim.  Both subsections (b)(1)(A) and (b)(1)(B) involve the use of a vehicle to flee, with subsection (b)(1)(B) additionally requiring that this use "creat[e] a substantial risk of bodily injury."  So a fleeing driver who violates subsection (b)(1)(B) necessarily runs afoul of subsection (b)(1)(A) as well.  The Government contends, in response, that a person can violate subsection (b)(1)(B) and *not* (b)(1)(A) by engaging in conduct *other than* vehicular flight.  See Brief for United States 48–49, n. 11. That is because subsection (b)(1)(B) additionally prohibits "obstruct-[ing]" or "resist[ing]" a police officer by a variety of means, including through use of a vehicle.  But Indiana law makes clear that subsection (b)(1)(A) still counts as a lesser included offense of subsection (b)(1)(B) in any prosecution involving vehicular flight.  See *Wright* v. *State*, 658 N. E. 2d 563, 566–567 (Ind. 1995) (holding a crime to be a lesser included offense if its elements are "factually" subsumed within another offense).  And even if that were not the case, it should make no difference.  The meaningful question for purposes of ACCA is whether subsection (b)(1)(B)'s prohibition of aggravated vehicular flight indicates that subsection (b)(1)(A) targets simple vehicular flight.  That a

*ante*, at 8–9 (THOMAS, J., concurring in judgment). But the Court is wrong to think that fact dispositive.

In general, "similar punishment does not necessarily imply similar risk" (or similar violence). *James,* 550 U. S., at 217 (SCALIA, J., dissenting). Because this is so, the Court has never suggested that all state offenses falling within a single felony class and subject to the same penalties must receive the same treatment under ACCA. To the contrary, we have always focused on the "conduct encompassed by the elements of the offense," *id.,* at 208 (majority opinion)—an inquiry that does not mention the offense's sentencing consequences. And that is for good reason. It would be quite remarkable if either all or none of Indiana's (or any State's) class D felonies satisfied the requirements of the residual clause. In Indiana, other such felonies, subject to "the same magnitude" of punishment, *ante,* at 12, include election fraud, computer tampering, and "cemetery mischief." See Ind. Code §3–14–2–1 *et seq.* (2009); §35–43–1–4; §35–43–1–2.1. I presume the Court does not also intend to treat these offenses as violent felonies under ACCA.

Moreover, Indiana sentencing law has always enabled judges to take account of the difference between subsections (b)(1)(A) and (b)(1)(B) in imposing punishment. As the majority notes, *ante,* at 12, Indiana provides for a range of prison terms for class D felonies, stretching from six months to three years. And in deciding what term to impose (or whether to suspend the term), courts may consider an array of aggravating factors—including whether the crime "threatened serious harm to persons," §35–38–1–7.1(b)(1). Convictions under subsections (b)(1)(A) and (b)(1)(B) therefore may produce widely varying sentences, as judges respond to the different forms

―――――――――

person can violate subsection (b)(1)(B) by means independent of *any* vehicular flight has no bearing on that question.

of vehicular flight targeted by the offenses.

The Court argues, in support of its position, that the "similarity in punishment" reveals that the conduct falling within subsection (b)(1)(A) is "rough[ly] equivalent," in terms of risk, to the conduct falling within subsection (b)(1)(B). *Ante*, at 12 (internal quotation marks omitted); see also *ante*, at 10–11 (THOMAS, J., concurring in judgment). More specifically, the Court claims that the Indiana Legislature added subsection (b)(1)(A) to the statute in 1998 because it determined that vehicular flight is *per se* risky—and that all such flight therefore deserves the same punishment as is meted out to the various non-flight conduct that subsection (b)(1)(B) prohibits upon a showing of risk. See *ante*, at 12; see also n. 9, *supra*. But that argument disregards the legislature's decision to criminalize vehicular flight in *both* provisions—that is, to retain subsection (b)(1)(B)'s prohibition on *risky* vehicular flight alongside subsection (b)(1)(A)'s ban on simple flight. In effect, the Court reads subsection (b)(1)(A) as including all vehicular flight and subsection (b)(1)(B) as including only the other (non-flight) things it mentions—even though subsection (b)(1)(B) specifically bars "flee[ing] from a law enforcement officer . . . in a manner that creates a substantial risk of bodily injury."

Perhaps the Court assumes that the Indiana Legislature, in enacting subsection (b)(1)(A), simply forgot to remove the reference to vehicular flight in subsection (b)(1)(B). Cf. *ante*, at 10 (THOMAS, J., concurring in judgment) (acknowledging superfluity). But if so, the legislature forgot four more times to correct its error, as it serially amended and re-amended its vehicular-flight statute over the last 13 years.[10] And more fundamentally, a

——————

[10] See 2011 Ind. Acts pp. 91–92; 2010 Ind. Acts pp. 1196–1197, 1186–1187; 2006 Ind. Acts p. 2470. Notably, one of these amendments revised subsection (b)(1)(B) itself. See *ibid.*

better explanation than legislative mistake is available for Indiana's decision to enact subsection (b)(1)(A) while keeping subsection (b)(1)(B)'s ban on risky vehicular flight. Prior to 1998, Indiana, unlike most other States in the nation, cf. *infra,* at 13, did not criminalize simple vehicular flight (*i.e.*, failure to stop) *at all*. See 1998 Ind. Acts 677–678. So Indiana's decision to create that offense in subsection (b)(1)(A)—and to distinguish it from the more aggravated forms of vehicular flight already penalized under subsections (b)(1)(B), (b)(2), and (b)(3)—brought the State's vehicular-flight statute into conformity with the prevailing approach used nationwide. Especially given that backdrop, I would not impute shoddy draftsmanship to the Indiana Legislature. I would heed what that body said, rather than assume (just because it made both offenses class D felonies) that it must have meant something different. And what the legislature said is that vehicular flight comes in different forms—one posing substantial risk of injury (subsection (b)(1)(B)) and one not (subsection (b)(1)(A)).

The best that can be said for the Court's approach is that it is very narrow—indeed, that it decides almost no case other than this one. As noted above, see *supra*, at 10, the Court reserves the question whether a vehicular flight provision like subsection (b)(1)(A) is a crime of violence under ACCA "where that offense carries a less severe penalty than [a greater] offense that includes it." *Ante*, at 13. But as fate would have it, that reservation describes the great majority of vehicular flight statutes across the country. Indiana is idiosyncratic in this respect; other States not only separately prohibit, but also differently punish, simple and aggravated vehicular flight.[11]  Or

——————

[11] See, *e.g.,* Fla. Stat. §316.1935 (2010); Mich. Comp. Laws Ann. §257.602a (West 2010); Minn. Stat. §609.487 (2009); N. J. Stat. Ann. §2C:29–2 (West Supp. 2011); S. C. Code Ann. §56–5–750 (2006); Tenn.

perhaps I should say Indiana *was* idiosyncratic. That is because in 2006, a few years after Sykes's conviction, Indiana amended its vehicular flight statute to set different penalties for violations of subsections (b)(1)(A) and (b)(1)(B). A person who violates subsection (b)(1)(B) today faces a mandatory 30-day sentence that cannot be suspended; that sentence rises to six months or one year for repeat offenders. See Ind. Code §35–44–3–3(d). By contrast, a person who violates subsection (b)(1)(A), even more than once, is not subject to any mandatory jail time. See §35–44–3–3(d). So by its own terms, the Court's opinion—our fourth applying ACCA's residual clause in as many years—applies only to a single State's vehicular flight statute as it existed from 1998 to 2006. Cf. *ante*, at 7 (SCALIA, J., dissenting) ("[W]e will be doing ad hoc application of ACCA . . . until the cows come home").

\*     \*     \*

The Indiana statute before us creates a series of escalating offenses dividing the universe of vehicular flight into discrete categories. One of those categories, subsection (b)(1)(B), requires proof that the defendant operated "a vehicle in a manner that creates a substantial risk of bodily injury." That phrase tracks the language that ACCA's residual clause uses to define a crime of violence. Other provisions in the Indiana statute demand even more—actual injury or death. In stark contrast, subsection (b)(1)(A), the least severe of the State's vehicular flight offenses and the one of which Sykes was convicted, lacks any element relating to threat of physical injury. In deciding this case, I would respect that statutory difference. And because I would take the Indiana Legislature at its word, I respectfully dissent.

———————

Code Ann. §39–16–603 (Supp. 2011); Tex. Penal Code §38.04 (West 2011); Utah Code Ann. §76–8–305.5 (Lexis 2008).