[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15168

_____

D. C. Docket No. 1:11-cr-20635-RNS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ENRIQUE VINALES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 2, 2014)

Before ANDERSON, Circuit Judge, and MOODY[*] and SCHLESINGER,[**] District
Judges.

--------

[*] Honorable James S. Moody, Jr., United States District Judge for the Middle District of
Florida, sitting by designation.

[**] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District
of Florida, sitting by designation.

SCHLESINGER, District Judge:

Enrique Vinales appeals his convictions following a jury trial for three counts of conspiring to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846; one count of conspiring to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(1)(a)(1) and 846; two counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; one count of possessing with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Specifically, Vinales argues that the District Court erred by: (1) admitting unlawfully obtained wiretap evidence and physical evidence—fruit of the poisonous tree—subsequently seized from Vinales' house pursuant to a search warrant; (2) admitting improper opinion testimony in violation of the Federal Rules of Evidence, the Fifth Amendment, and the Sixth Amendment; (3) allowing the jury to convict Vinales on insufficient evidence to prove beyond a reasonable doubt that he conspired to distribute heroin; (4) allowing the government to make inflammatory arguments in violation of Vinales' rights to due process and a fair trial; and (5) allowing the jury to convict Vinales despite the cumulative effect of many serious errors.

Vinales also appeals his total sentence of 204 months' imprisonment, arguing that the District Court erred in concluding that he qualified for the career

2

offender and armed career criminal enhancements.  Specifically, Vinales argues that his prior state convictions for cocaine trafficking, fleeing and eluding police at high speed, and resisting arrest with violence do not qualify as a predicate offenses. He further contends that the residual clauses of the Armed Career Criminal Act ("ACCA") and career offender enhancements are unconstitutionally vague.

Finding no reversible error, we now affirm.

## I.  BACKGROUND

During December 2010 and January 2011, a joint task force of federal and state law enforcement had focused an investigation on the activities of codefendant Michael Cooper, whom they had identified as a heroin distributor in the Overtown area of Miami, Florida.  In April and again in May 2011, an informant received heroin from Cooper near Cooper's apartment.  At that time, the investigation aimed to identify Cooper's heroin source.  Law enforcement obtained a wiretap for Cooper's phone and beginning in April 2011, over a period of 30 days, numerous incriminating calls and text messages between Cooper and Vinales were intercepted, and Vinales was soon identified as one of Cooper's main suppliers. Many of these calls and text messages used code-words, and at trial, the District Court permitted DEA Special Agent Edward J. Willett, III—the case agent assigned to the investigation of Vinales—to interpret these coded conversations for the jury.

3

On June 3, 2011, while under police surveillance, a confidential informant ("PeeWee") purchased "six bundles" of heroin from Vinales. Inside each "bundle" were 10 small baggies of heroin individually sized for personal use (a total of 60 personal-use baggies). The gross weight of the heroin was 39 grams. At trial, the government introduced into evidence the undercover tape recording of this meeting between PeeWee and Vinales.

Between August 3 and 31, 2011, police intercepted Vinales' cell phone conversations via a wiretap. Through the wiretap, police intercepted communications between Vinales and Codefendant Maria "Mari" Audevert, who lived across the street from Vinales' Overtown home. Audevert assisted Vinales in packaging heroin, and throughout the entire wiretap, police watched her transport Vinales to and from narcotics deals. At trial, the government introduced into evidence intercepts of conversations between Vinales and Audevert. During a conversation with Audevert on August 8, while she was shopping at Wal-Mart, Vinales told her to buy a coffee grinder. He further specified that she should buy "the regular one." Agent Willett testified that grinders are used to convert chunks of substance containing heroin into a fine powder for packaging and distribution. During a call on August 23, Vinales and Audevert discussed how the police stopped codefendant Darrell Edmond, whom police believed had just received heroin from Vinales. On that same date, the police also stopped Audevert while

4

she was driving and accompanied by Vinales. The police found a small amount of marijuana on Audevert and arrested her, but they found nothing on Vinales aside from $558 in cash.

After reviewing the telephone intercepts, police determined that Edmond worked with Vinales packaging and distributing heroin. On August 4, 2011, Vinales told Edmond during a phone call that he had "[j]ust enough to make for a 14"—a reference to 14 grams (half an ounce) of heroin. During an intercepted call on August 9, 2011, Vinales confirmed with Edmond that Edmond had made "five packs"—a reference explained to the jury to mean five separate lots of heroin that each contained between two and five "bundles," each of which were comprised of 10 individual baggies. Each bundle would sell for around $100. On August 10, Vinales and Edmond discussed how Edmond had found it difficult to locate customers for the heroin he had purchased from Vinales. In August 2011, Edmond also discussed his heroin distribution arrangement with codefendant Elliott Hudson, specifically telling Hudson that Edmond "would be at [Vinales'] house helping [Vinales] bag up, like, a quarter key or half key of heroin at a time."

Codefendant Hudson pled guilty, under a plea agreement, to a count of the superseding indictment that charged him with conspiring to distribute heroin with Vinales. Hoping for leniency, Hudson testified against Vinales in Vinales' trial. Hudson had numerous prior felony convictions and a history of distributing

5

narcotics, and he described himself as "a career drug dealer."  Hudson testified that back in 2000, he and Vinales entered into a business arrangement and he began purchasing cocaine from Vinales.  Hudson testified that sometime during June 2011, he asked Vinales whether Vinales had drugs that Hudson "could try to make . . . some money off of."  Vinales said he had some "good heroin" that he was now selling, and Vinales agreed to supply some of it to Hudson.  Vinales volunteered to visit a store owned by Hudson's family members and give Hudson some heroin samples for Hudson's customers to try.  The same day, Vinales met with Hudson outside the store, arriving in a red vehicle driven by Audevert.  Vinales gave Hudson five or six sample baggies of heroin, each containing about 0.3 grams, so that Hudson's customers could determine its quality.  Thereafter, Hudson began purchasing heroin from Vinales to sell on the streets of Overtown.

At the time, Hudson was on work release and "had no money," so he asked whether Vinales would front him the heroin.  Vinales agreed and began fronting Hudson with 7 grams of heroin, known as a "vick" (because NFL quarterback Michael Vick wears jersey number 7).  Hudson sold the vick within about a week, and after Hudson paid Vinales, Vinales would provide him with another vick.  Hudson paid Vinales $550 for each vick.  After Hudson divided and sold the vick, he "would make no less than $1,500."  Hudson enlisted the help of others to distribute the heroin, and Vinales supplied Hudson with a vick of heroin on a

6

weekly basis.  While dealing with Vinales, Hudson had a constant supply of heroin because Vinales fronted it to him.

Hudson identified his phone calls with Vinales that police had intercepted and recorded.  During these calls, the two discussed their drug distribution arrangement.  Hudson's heroin orders to Vinales always took the form of 7 gram vicks.  On August 5, 2011, Hudson told Vinales during several phone calls and text messages that his accomplices wanted a vick of heroin to distribute and were waiting with him.  After the calls, Vinales appeared with the drugs and Hudson paid him $550 for the prior amount that Vinales had fronted to him and Hudson had sold.  The next day, Hudson arranged for Vinales to deliver another vick at the Hudson family store.  Vinales appeared, fronted the drugs, and Hudson again paid him $550 for the previous order.

Likewise, on August 8, Hudson texted Vinales that Hudson's uncle wanted two vicks. Vinales agreed to a sale price of $1,000 for the double-order and completed the transaction with Hudson in his family's store.  Later that day, Vinales reappeared with another vick for Hudson to sell.  Yet another vick transaction was scheduled for the following day, but Hudson owed Vinales for a vick that had been fronted.  Hudson did not have the money because business had been slow.  Business remained slow on August 25, but Hudson assured Vinales that he would soon have the money that he owed him.

7

Hudson learned of Vinales' arrest on August 31, 2011. He never paid Vinales the money that he owed him. At trial, the government played a portion of a taped call that took place between Vinales and codefendant Audevert while Vinales was in jail. The call concerned the money that Hudson owed. After this call, Audevert visited Hudson and asked whether he had the money. Hudson did not. Audevert asked Hudson a second time for the money, but he did not pay her.

Codefendant Kenya Macon pled guilty to one of the counts of the superseding indictment and also testified as a government witness. Macon had several prior convictions for selling drugs and hoped that his cooperation in Vinales' trial would result in leniency. Macon, like some of the other codefendants, had known Vinales since junior high school. Macon made contact with Vinales in February 2011, "[b]ecause [Vinales] knew where to get the good . . . drugs from," and he began selling heroin. They met in a park to discuss Macon's purchases of heroin from Vinales. Vinales offered to sell Macon a vick for between $550 and $600, two vicks for between $1,100 and $1,200, and three vicks for between $1,600 and $1,700. Vinales then began supplying Macon with heroin. When they discussed quantities, they spoke in coded terms. For example, if Macon wanted 21 grams of heroin, he would refer to meeting a friend "on 21st Street," and if he wanted 14 grams, he would instead indicate 14th Street.

Between February 2011 and Vinales' arrest on August 31, 2011, Macon

8

typically ordered between 14 and 21 grams of heroin from Vinales once a week. Macon then ground up the heroin and distributed it in little baggies. Vinales and Audevert would arrive at a parking lot where Macon would be waiting. Macon would sit in the back seat of the vehicle with Vinales and conduct the transaction. Macon testified about a number of taped intercepts of his conversations with Vinales. Macon expressed a preference for high-quality heroin, telling Vinales that the better the quality the faster it would sell. On two or three occasions when Macon did not have the money, Vinales fronted him the heroin.

On August 12, 2011, the informant "PeeWee" again met with Vinales, resulting in a second controlled purchase of approximately 60 baggies of heroin from Vinales. During this transaction, PeeWee asked Vinales, in coded terms, whether he would be upset if Pee Wee were to sell the heroin to others. Vinales responded that he would not, explaining that "[t]here's enough . . . money in this for all of us, Dog." On August 25, in a third controlled purchase, PeeWee acquired approximately 70 baggies of heroin from Vinales. The transactions occurred near Vinales' residence, and during the third undercover purchase, Vinales was seen going into his home to retrieve the heroin that he then sold to the informant.

On August 31, 2011, a Miami SWAT team and federal agents executed a search warrant on Vinales' home. From the home, they seized the following pieces of physical evidence: a small .22 caliber pistol; a Glock pistol with loaded

9

magazines; a semi-automatic rifle with a magazine capable of holding 30 rounds; ammunition of various calibers; roughly $4,000 in currency; a box containing hundreds of small baggies contained within larger plastic bags; a razor blade commonly used to package heroin and other narcotics; a plate with a sifter on it; two digital scales; cutting agent; a heat sealer used by narcotics dealers to seal plastic baggies containing heroin; and brown and black tar heroin with large plastic bags containing multiple smaller baggies full of heroin.  Officers seized heroin found in "packs" filled with small bags of heroin which, in turn, were assembled into larger "bundles."  In sum, the police found two ounces of heroin—a quantity worth over $4,000.

After his arrest, Vinales was placed in the Miami Federal Detention Center, where tape recordings were made of phone calls that he placed to Audevert and Edmond.  During a phone call with Audevert on September 20, 2011, Vinales told her to direct Edmond to "send in some money."  On September 28, Vinales and Edmond discussed what Hudson owed Vinales—$525, which corresponded to a vick of heroin.

Vinales proceeded to trial, and a jury convicted him on Counts 1, 9, 11, 13, 16, 19, 20, and 22 of the 23-count superseding indictment.  After calculating a guidelines range of 360 months to life imprisonment, the District Court departed downward and imposed a total sentence of 204 months.  Vinales then initiated this

10

appeal, attacking both his convictions and his sentence.

## II.  STANDARDS OF REVIEW

### A.  Conviction

A district court's denial of a motion to suppress evidence is reviewed as a mixed question of law and fact, with findings of fact reviewed for clear error and application of the law to those facts reviewed *de novo*.  *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010).

This Court reviews a district court's decision to admit lay testimony under Fed. R. Evid. 701 for a clear abuse of discretion.  *United States v. Myers*, 972 F.2d 1566, 1576–77 (11th Cir. 1992).

This Court reviews *de novo* whether the record contained sufficient evidence to support the jury's guilty verdict.  *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).  Viewing the evidence in the light most favorable to the government, this Court asks "whether there is substantial evidence to support the verdict[]."  *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir. 1986).

Claims of prosecutorial misconduct are ordinarily reviewed *de novo*.  *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).  But when a defendant has failed to assert a contemporaneous objection to the alleged misconduct, plain error

11

review applies. *United States v. Newton*, 44 F.3d 913, 920 (11th Cir. 1995); *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). To establish plain error, a defendant must show that there was an "(1) error, (2) that is plain and (3) that affects substantial rights." *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007) (internal quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). "An error is not plain unless it is contrary to explicit statutory provisions or to on-point precedent in this Court or the Supreme Court." *United States v. Schultz*, 565 F.3d 1353, 1357 (11th Cir. 2009). In any event, this Court will not disturb a conviction based on a prosecutor's remarks unless those remarks are improper and prejudicial to the defendant's substantial rights. *United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011). "[R]emarks prejudicially affect the substantial rights of the defendant when they so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) (internal quotation marks omitted). The defendant bears the burden of persuasion with respect to showing prejudice. *United States v. Olano*, 507 U.S. 725, 734 (1993).

This Court reviews *de novo* whether cumulative errors have deprived the

12

defendant of a fair trial. "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997).

### B. Sentence

This Court reviews *de novo* whether a defendant's prior conviction qualifies as a "violent felony" or "serious drug offense" under the Armed Career Criminal Act. *United States v. James*, 430 F.3d 1150, 1153 (11th Cir. 2005). This Court also reviews *de novo* a district court's decision to classify a defendant as a career offender pursuant to U.S.S.G. § 4B1.1. *United States v. Whitson*, 597 F.3d 1218, 1220 (11th Cir. 2010). However, challenges raised for the first time in a criminal appeal are reviewed for plain error. *See Schultz*, 565 F.3d at 1356.

## III. DISCUSSION

### A. Conviction

#### 1. Wiretap Evidence & Evidence Subsequently Seized from Vinales' House

Vinales first argues that the District Court erred in permitting the government to introduce wiretap evidence and, as the tainted fruits therefrom, the

13

physical evidence obtained from his home.   Vinales notes that a government application for a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."   18 U.S.C. § 2518(1)(c).   Vinales argues that the government's application for the wiretap of his cell phone failed to meet this requirement and was, therefore, unlawful, and so too were the tainted fruits of the subsequent search of his home.

In the Vinales wiretap affidavit, Special Agent Willett stated that the purpose of the wiretap was to:

> (1) identify VINALES's source of supply and work up the ladder to any bulk supplier and the individuals and organizations importing or transporting domestically the heroin into South Florida; (2) discover[] the full scope and identification of key personnel involved in illegal drug trafficking business of the VINALES DTO ["Drug Trafficking Organization"] and others; (3) discover[] the nature, extent, and methods of operation, including the financial aspects, storage and stash locations, and record keeping [of] VINALES DTO and others related to the VINALES DTO.

Willett then affirmed that the following investigative techniques had been employed but proved insufficient to achieve the aforementioned investigative goals: (1) two informants (unlikely to reveal Vinales' supply sources); (2) physical surveillance (risk that targets would discover the surveillance and the investigation would be compromised); (3) undercover agent (not trusted enough to be introduced to higher level members of the organization—even accused of being a police

14

officer—and never established contact with Vinales); (4) consensually recorded conversations (could only relate to buyer–seller relationship because informant posed as a buyer); (5) search warrants executed on co-defendant Cooper (evidence did not aid in identifying Vinales' supply sources or storage locations); and (6) other investigative techniques, including interviews, grand jury subpoenas, immunity offers, arrests, trash searches, pole cameras and tracking devices, pen registers, mail cover requests, other wiretaps, and financial investigation.

At the hearing on Vinales' pretrial motion to suppress, it came to light that around the time Special Agent Willett filed his affidavit requesting the Vinales wiretap, other agents had been interviewing an incarcerated, cooperative individual ("Rodriguez"), who had advised agents in another DEA group that he (Rodriguez) had been one of Vinales' suppliers prior to his (Rodriguez's) arrest and that Vinales stored drugs in his (Vinales') home. This information had not been included in the wiretap application. Even so, the District Court concluded that the government's affidavit did not contain any material misrepresentations or omissions. The court accepted Agent Willett's testimony that he was unaware of Rodriguez's statements regarding Vinales when he submitted the wiretap application. The court also found that even if Willett was or should have been aware of Rodriguez's statements, "that does not resolve the unanswered question of whether Vinales had a new, or additional, supplier [after Rodriguez's

15

incarceration] and if so, the identity of that person." The court concluded that the wiretap application "contained a full and complete statement explaining other investigative procedures that had either been tried and had failed or that reasonably appeared to be unlikely to succeed, or too dangerous, if tried." Accordingly, the District Court found that the wiretap application met § 2518's necessity requirement and did not taint the search of Vinales' residence. Finally, the District Court found that the affidavit in support of the search warrant of Vinales' residence was sufficient even without reference to the wiretap evidence. The District Court, therefore, denied Vinales' motion to suppress. Vinales contends that this was error.

To meet the "necessity" requirement of 18 U.S.C. § 2518, the government's wiretap application does not need to "show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). The statute does not seek to "foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984) (internal quotation marks omitted). The statute does not require that wiretaps be used as a last resort. *United*

16

*States v. Cifarelli*, 589 F.2d 180, 183 (5th Cir. 1979); *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all opinions issued by the former Fifth Circuit prior to the close of business on September 30, 1981). Rather, the statute merely ensures that wiretapping is not "routinely employed as the initial step in criminal investigation" or relied on when less intrusive and more conventional techniques will succeed. *United States v. Giordano*, 416 U.S. 505, 515 (1974); *Van Horn*, 789 F.2d at 1496. In particular, the statute does not "permit the government merely to characterize a case as a 'drug conspiracy' that is therefore inherently difficult to investigate." *United States v. Carrazana*, 921 F.2d 1557, 1565 (11th Cir. 1991) (internal quotation marks omitted).

Vinales' argument fails. Agent Willett's wiretap application catalogued numerous tried and failed investigative methods. The application also gave the reasons those methods had failed—or would likely fail in the future—to identify Vinales' heroin source and all his accomplices. The application explained that informants were unable to gain Vinales' trust, and could only establish a buyer-seller relationship—they were not positioned to learn about Vinales' heroin source. The pen register and trap-and-trace devices only provided the government with a list of numbers called and would not establish the identities of all the persons called or the contents of the conversations. And physical surveillance posed a risk

17

that Vinales would discover the investigation and render future efforts ineffective. Finally, we have no basis to disturb the District Court's factual finding that, at the time he filed the wiretap application, Willett was unaware of Rodriguez's statements to other DEA agents.

Because the wiretap was lawful, evidence obtained from it did not taint the search warrant application for Vinales' home. But even assuming that the wiretap was unlawful, the search warrant application contained more than enough other information to independently justify a finding of probable cause. The affidavit observed that informants had made controlled purchases of heroin from Vinales, and Vinales had even retrieved drugs from his home to make one of the deals. Another individual had been stopped by police near Vinales' home after buying heroin from him, and Vinales had emerged from his home to make the deal. Finally, an informant told Willett that Vinales and Audevert had been carrying heroin when law enforcement stopped their vehicle on August 17, 2011, after they had left Vinales' home, and that Vinales had told the informant that police did not discover the heroin because Audevert had concealed it in her vagina. These observations independently established probable cause to believe that Vinales was storing heroin in his home.

### 2.  Admission of Opinion Testimony

The government's case relied heavily on tape recordings, recorded calls, and

18

testimony by codefendants and informants. Much of the information that these sources conveyed was encoded—numbers like "$10," "$7," 14, and 60, and terms like "vick," "grinder," and "shit" were used. The District Court allowed Agent Willett, over Vinales' objections, to interpret this coded language throughout the trial for the jury. Vinales contends that this violated Rule 701 of the Federal Rules of Evidence, and the District Court clearly abused its discretion, because Agent Willett based his testimony on his generalized training and experience, rather than perceptions gleaned from his investigation of this case, and Willett was never noticed or qualified as a government witness. Vinales notes that the government responded to defense objections by contending that Willett could testify "based on his training and experience." Vinales further notes that during cross examination, Willett admitted that he based his opinions on his "expertise" and that he had been testifying as an "expert." This error affected Vinales' substantial rights, he contends, because Willett's testimony was pervasive and foundational to the government's case against him. The government responds that it did not tout Agent Willett as an expert; that was merely Vinales' characterization on cross examination.

Rule 701 of the Federal Rules of Evidence allows a lay witness to offer opinions or inferences if they are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a

19

fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This third limitation regarding "scientific, technical, or other specialized knowledge" was enacted as part of the amendments to Rule 701 in the year 2000, in an effort to prevent parties from evading the heightened requirements of Rule 702 "through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701, Advisory Comm. Notes (2000 Amendment). Since the amendment, this Court has allowed police officers to give interpretations of code words in recorded conversations when the meaning of those words was gleaned from their experience and perceptions derived from the specific case under investigation. *United States v. Jayyousi*, 657 F.3d 1085, 1104 (11th Cir. 2011) (allowing agent to testify about meaning of code words that he learned by examining documents during a prolonged investigation because he limited his opinions to things he learned from the subject investigation); *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1221–23 (11th Cir. 2003) (considering officer testimony in criminal cases and holding that lay witnesses can testify "based on their particularized knowledge garnered from years of experience within the field"). Such interpretations cannot be given by a lay witness, however, when they are based solely on the witness' general expertise. *Jayyousi*, 657 F.3d at 1103–04.

Agent Willett was not an expert witness in lay witness clothing. He was the

20

case agent in Vinales' case and was the agent who applied for the wiretap and search warrant.  He had been in the wire room for the intercepts, and he had listened to the recordings and authenticated them at trial.  He had interacted with the informants and helped conduct surveillance.  This Court cannot say that the District Court clearly abused its discretion in permitting Agent Willett's interpretive opinions unless this Court were to ignore Willett's intimate level of involvement with the investigation and instead parse the words of a few solitary responses to defense objections and cross-examination questions.  Willett did not opine, based on his other investigative experiences, about the meaning of certain code words in the drug trade generally.  Rather, he testified that, from his experiences during this particular investigation, he believed that when Vinales and other codefendants used certain code words, those words meant certain things.  In particular, Agent Willett identified several code words that he believed referred to heroin based on his perception that most of Vinales' drug transactions involved heroin.  This is perfectly within the province of lay witness testimony under Rule 701.  *Jayyousi*, 657 F.3d at 1104.  To the extent that Willett partially relied on his experience as a DEA agent to interpret the perceptions upon which he formed his opinions, Rule 701 accommodates the reality that police officers do not make perceptions in a vacuum during criminal investigations.  *United States v. Novaton*, 271 F.3d 968, 1008 (11th Cir. 2001) (a witness does not have to be qualified as an

21

expert simply because his perceptions are based in part on his past experiences); *cf. also Tampa Bay Shipbuilding & Repair Co.*, 320 F.3d at 1221–23 (the post-2000 amendments to Rule 701 do not alter the Eleventh Circuit's Rule 701 jurisprudence in cases where police officers testify as lay witnesses in criminal cases).

### 3.  Sufficiency of the Evidence

Vinales next argues that the evidence was insufficient to prove that he conspired to distribute heroin and that, at most, the government only proved that he had a buyer-seller relationship with the codefendants.  This argument relates only to the heroin distribution conspiracy counts (1—conspiracy with Cooper, 9—conspiracy with Edmond and Audevert, 11—conspiracy with Hudson, and 13—conspiracy with Macon) of the Superseding Indictment.

Vinales correctly notes that to prove a conspiracy to distribute heroin, the government needed to prove that he *entered into an agreement* with one or more persons to *distribute* heroin; proof of a mere buyer-seller arrangement will not suffice.  *United States v. Dekle*, 165 F.3d 826, 829 (11th Cir. 1999); *United States v. Mercer*, 165 F.3d 1331, 1335 (11th Cir. 1999); *United States v. Brazel*, 102 F.3d 1120, 1136 (11th Cir. 1997).  The government may prove the existence of an agreement by either direct or circumstantial evidence, "such as inferences from the conduct of the alleged participants."  *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir. 1983) (internal quotation marks omitted).  The government may prove

22

knowledge by demonstrating "that the defendant knew the essential object of the conspiracy." *United States v. Russell*, 703 F.2d 1243, 1250 (11th Cir. 1983).

Vinales is incorrect, however, in his assertion that the government only presented buyer-seller evidence at trial. This Court has held that a conspiratorial agreement to distribute—rather than merely to buy or sell—narcotics can be inferred when evidence shows a continuing relationship that results in repeated transfers of illegal drugs to the purchaser, *United States v. Beasley*, 2 F.3d 1551, 1560–61 (11th Cir. 1993); *United States v. Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005), or when the quantity sold is sufficient for the seller to know that the drugs he is supplying will be distributed to others, *Brazel*, 102 F.3d at 1135–36, or when a supplier "fronts" drugs to purchasers, *United States v. Burroughs*, 830 F.2d 1574, 1581 (11th Cir. 1987). The jury had overwhelming evidence from which to infer that Vinales agreed to provide large quantities of heroin to the codefendants on an ongoing basis with knowledge that they would distribute the heroin to others. Vinales called Cooper regarding two separate orders of large quantities of heroin. Vinales regularly fronted heroin to Hudson and Macon. Hudson testified that Edmond admitted that he and Vinales would bag up substantial quantities of heroin at a time at Vinales' house. Evidence showed that Audevert helped Vinales package heroin and frequently drove him to narcotics deals. Audevert also attempted—at Vinales' request—to collect the $525 that Hudson owed Vinales for

fronted heroin.

To the extent that Vinales has simply launched an attack on the credibility of the government's informant witnesses, he seeks to invade the province of the jury. "So long as a reasonable jury could believe an informant's testimony after hearing relevant impeachment evidence regarding his or her reliability, the government may rely on such testimony." *United States v. Richardson*, 764 F.2d 1514, 1521 (11th Cir. 1985). The jury was entitled to credit Hudson's and Macon's testimony, and Vinales' argument to the contrary is meritless.

### 4. Inflammatory Government Arguments

Vinales next argues that during closing argument, the government improperly suggested that he was guilty because other co-conspirators had pled guilty, and improperly vouched for the credibility of its witnesses, in violation of his rights to due process and a fair trial. The government responds that it did not make any such argument, but merely made "fair reply" to Vinales' arguments. The government further contends that even if this Court were to assume that the prosecutor made an improper argument, the District Court removed any prejudicial effect with its curative instruction that the guilty pleas of others could not be considered as evidence of Vinales' guilt.

During trial, Vinales elicited testimony from Agent Willett that charges against one of the original codefendants were dropped and another codefendant

24

pled to a misdemeanor marijuana charge rather than the original heroin charges. Vinales suggested that the pleas were the result of a sloppy investigation that had led to charges unsupported by the evidence. On re-direct of Willett, the government argued that Vinales had opened the door to a discussion of the charges to which the codefendants had actually pled. Without any objection from Vinales, the government elicited from Willett the charges to which Vinales' codefendants had pled guilty.

In opening statement and closing argument, Vinales argued that the government's investigation in his case had become a "machine" that indiscriminately worked to obtain convictions even without evidence, and that agents simply wanted to be paid overtime without regard for the truth. Vinales also argued during closing that Audevert was not guilty of heroin conspiracy (even though she had pled guilty to the charge). Vinales also predictably attacked the credibility of the government's witnesses because they had received plea deals.

The prosecutor responded to these assertions. First, he showed that Vinales was inconsistent: he maintained that the investigation was a "machine" out to get everyone regardless of guilt but at the same time showed that some original codefendants had their charges dropped or dramatically reduced. The prosecutor also pointed out that Audevert, Edmond, Hudson, Cooper, and Macon all pled guilty to conspiracies to distribute heroin with Vinales, to rebut Vinales'

25

contention that the investigation was an uncalculated dragnet. The prosecutor pointed to evidence of Audevert's participation in the conspiracy, also mentioning her guilty plea as evidence of *her* guilt. Finally, the prosecutor asked the jury to consider why its cooperating witnesses did not simply say Vinales had a gun on him during the drug deals or that the conspiracy involved even more drugs over a longer period of time if in fact they were lying, as Vinales suggested. Vinales contemporaneously objected only to this last point.

After these arguments were made, the District Court instructed the jury that plea bargaining may bear on a witness' credibility, and also that "the fact that a witness has pleaded guilty to an offense isn't evidence of the guilt of any other person." Specifically, the court cautioned that "the fact that somebody in the same conspiracy as Mr. Vinales pled guilty[] is not evidence of Mr. Vinales' guilt in that conspiracy."

A prosecutor's argument violates the Constitution "if it renders the defendant's trial so fundamentally unfair as to deny him due process." *Davis v. Zant*, 36 F.3d 1538, 1545 (11th Cir. 1994) (internal quotation marks omitted). To meet this high bar, a defendant must show "a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different." *Id.*; *see also United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). This standard does not contemplate a line-by-line parsing of the

26

prosecutor's words under a microscope, but rather a holistic analysis of "whether a remark or a series of remarks, in the context of that trial, rendered the entire trial unfair." *Davis*, 36 F.3d at 1546. To make this determination, this Court looks to factors such as:

> 1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; 2) whether they are isolated or extensive; 3) whether they were deliberately or accidentally placed before the jury; and 4) the strength of the competent proof to establish the guilt of the accused.

*Id.* However, "[w]hen the record contains sufficient independent evidence of guilt, any error is harmless." *Eckhardt*, 466 F.3d at 947.

"One person's guilty plea or conviction may not be used as substantive evidence of the guilt of another." *United States v. King*, 505 F.2d 602, 607 (5th Cir. 1974). Furthermore, while a prosecutor can comment on a witness' credibility, he cannot *bolster* that credibility by placing the prestige of the government behind the witness or indicating that information not before the jury supports the witness' credibility. *United States v. Knowles*, 66 F.3d 1146, 1161 (11th Cir. 1995). These rules do not, however, require a prosecutor to fight with one hand while his opponent fights with two—he may make "fair response" to the defendant's arguments. *United States v. Suggs*, 755 F.2d 1538, 1539–40 (11th Cir. 1985); *United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir. 1978). Furthermore, "when a district court gives a curative instruction, the reviewing court will reverse

only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Delgado*, 321 F.3d 1338, 1347 (11th Cir. 2003) (internal quotation marks omitted).

Once again, the government has the better of the arguments. Viewed in context, the prosecutor's remarks were in fair reply to an argument on which Vinales had chosen to hang his hat during closing argument and opening statement. And even if the prosecutor's arguments had crossed the line, no prejudice resulted. The District Court gave a curative instruction, and the prosecution presented overwhelming evidence of Vinales' guilt, as we have previously discussed.

### 5.  Cumulative Prejudicial Effect of Many Serious Errors

As to his conviction, Vinales last argues that the cumulative prejudicial effect of the errors he alleges was greater than the effect of the errors standing alone and requires reversal. The cumulative error doctrine "provides that an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted). However, because Vinales cannot demonstrate any errors, let alone multiple errors, this argument fails.

### B.  Sentence

28

Vinales next asks this Court to overturn his sentence.  Over Vinales' objection, the District Court sentenced Vinales as an armed career criminal and career offender, calculating a guidelines range of 360 months to life imprisonment. The court departed downward on the basis of mitigating factors, imposing a total sentence of 204 months.  Vinales argues that the District Court erred by classifying him as an armed career criminal and a career offender.  Specifically, he contends that his prior state conviction for cocaine trafficking is not a predicate offense for the career offender and armed career criminal enhancements because the Florida statute prohibiting cocaine trafficking is more broad than the recidivist statutes outlined in U.S.S.G. § 4B1.2 and 18 U.S.C. § 924(e) for the enhancements.  He also preserves for further appellate review the argument that his prior state convictions for resisting arrest with violence and fleeing and eluding police are not violent felonies and should not have been used as predicate offenses for the enhancements.  Finally, Vinales contends that the residual clauses of the armed career criminal and career offender enhancements are unconstitutionally vague.

This Court reviews *de novo* Vinales' challenge as it relates to his prior convictions for fleeing and eluding police and resisting arrest with violence. *See James*, 430 F.3d at 1153; *Whitson*, 597 F.3d at 1220.  However, because Vinales did not object to the District Court's use of his cocaine trafficking conviction as a

29

predicate offense, this Court reviews that portion of his challenge for plain error. *See Schultz*, 565 F.3d at 1356.

Pursuant to § 4B1.1 of the federal sentencing guidelines, a convicted defendant qualifies as a career offender if: (1) he was at least eighteen years old when he committed the instant offense; (2) the instant offense "is a felony that is either a crime of violence or a controlled substance offense"; and (3) he has "*at least two prior felony convictions of either a crime of violence or a controlled substance offense*." U.S.S.G. § 4B1.1(a) (emphasis added). The guidelines define "crime of violence" as a state or federal offense punishable by imprisonment for more than one year that:

> (1) has as an element the use, or attempted use, or threatened use of physical force against the person of another, or
>
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*.

U.S.S.G. § 4B1.2(a) (emphasis added). Furthermore, a "controlled substance offense" means a state or federal offense punishable by imprisonment for more than one year "that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense." *Id.* § 4B1.2(b).

30

Pursuant to the Armed Career Criminal Act ("ACCA"), a person who violates 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) and has three previous convictions "for a violent felony or a serious drug offense, or both, committed on occasions different from one another" is classified as an armed career criminal and subject to a mandatory minimum sentence of 15 years' imprisonment. 18 U.S.C. § 924(e)(1). The residual clause of § 924(e) defines "violent felony" as any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* § 924(e)(2)(B)(ii). For intentional crimes, the relevant inquiry is "'whether the offense "presents a serious potential risk of physical injury to another" comparable to the risk posed by the ACCA's enumerated crimes.'" *Bryant v. Warden, FCC Coleman*, 738 F.3d 1253, 1276 (11th Cir. 2013) (quoting *Williams v. Warden, Federal Bureau of Prisons*, 713 F.3d 1332, 1347 n.6 (11th Cir. 2013)). The ACCA defines "serious drug offense" as:

> (i) an offense under the Controlled Substances Act . . . for which a maximum term of imprisonment of ten years or more is prescribed by law; or

> (ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of ten years or more is prescribed by law.

31

18 U.S.C. § 924(e)(2)(A).  Under § 4B1.4 of the guidelines, an armed career criminal is subject to an enhanced offense level.  U.S.S.G. § 4B1.4(b).

Binding precedent squarely forecloses Vinales' argument that his prior convictions for fleeing and eluding police and resisting arrest with violence do not qualify as predicate offenses.  This Court has held that resisting arrest with violence, in violation of Fla. Stat. § 843.01, is a "violent felony" under the residual clause of the ACCA.  *United States v. Nix*, 628 F.3d 1341, 1342 (11th Cir. 2010).  Moreover, binding precedent dictates that fleeing and eluding police at high speed in violation of Fla. Stat. § 316.1935(3) also constitutes a "violent felony" under the residual clause of the ACCA.  *Id.*; *see also Sykes v. United States*, 131 S. Ct. 2267, 2275–76 (2011) (holding that vehicular flight is a violent felony within the meaning of the ACCA); *c.f. also United States v. Petite*, 703 F.3d 1290, 1301 (11th Cir. 2013), *cert. denied* 134 S. Ct. 182 (2013) (holding that "simple vehicle flight" in violation of Fla. Stat. § 316.1935(2) qualifies as a "violent felony" under the ACCA).  This Court has noted that the definitions of "violent felony" and "crime of violence" under the ACCA and the career offender enhancements are "virtually identical," *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008), and in particular, we have held that a conviction under Fla. Stat. § 316.1935(3) is a "crime of violence" as defined by U.S.S.G. § 4B1.2(a) for purposes of the career offender enhancement.  *United States v. Harris*, 586 F.3d 1283, 1289 (11th Cir. 2009).

32

Therefore, not only do Vinales' prior convictions for fleeing police and resisting arrest with violence qualify as predicate offenses for the armed career criminal enhancement—they also qualify as predicate offenses for the career offender enhancement.

This leaves us with Vinales' prior cocaine trafficking conviction. The Florida statute prohibiting cocaine trafficking provides, in relevant part, that:

> Any person who knowingly sells, purchases, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, 28 grams or more of cocaine . . . or of any mixture containing cocaine, but less than 150 kilograms of cocaine or any such mixture, commits a felony of the first degree, which felony shall be known as "trafficking in cocaine" . . . . If the quantity involved:
>
> a. Is 28 grams or more, but less than 200 grams, such person shall be sentenced to a mandatory minimum term of imprisonment of 3 years, and the defendant shall be ordered to pay a fine of $50,000.
>
> b. Is 200 grams or more, but less than 400 grams, such person shall be sentenced to a mandatory minimum term of imprisonment of 7 years, and the defendant shall be ordered to pay a fine of $100,000.

Fla. Stat. § 893.135(1)(b)(1). In *James*, this Court held that a conviction under Fla. Stat. § 893.135 for ***possessing*** between 200 and 400 grams of cocaine with intent to distribute qualified as a "serious drug offense" for purposes of the ACCA because "Florida's drug trafficking statute necessarily infers an intent to distribute once a defendant possesses 28 grams or more." *James*, 430 F.3d at 1155–56. However, in *United States v. Shannon*, 631 F.3d 1187, 1189–90 (11th Cir. 2011),

33

this Court held that ***purchasing*** cocaine with intent to distribute under Fla. Stat. § 893.135 did not qualify as a "controlled substances offense" under the career offender enhancement because the Sentencing Guidelines' definition of "controlled substances offense" did not include the term "purchase." This Court noted that although the definitions of "controlled substances offense" for purposes of the career offender enhancement and "serious drug offense" under the ACCA are similar, this Court's decision in *James* "is distinguishable because the defendant's prior conviction [in *James*] involved possession with intent to distribute . . . [whereas *Shannon* involved] purchase with intent to distribute. The difference is critical because, while possession with intent to distribute is included in both definitions, purchase with intent to distribute is not." *Shannon*, 631 F.3d at 1190 n.3.

As to Vinales' state cocaine trafficking conviction, he has not shown that the District Court plainly erred in using this as a predicate offense. True, this Court's precedent indicates that Fla. Stat. § 893.135 is more broad than the definitions of "controlled substances offense" and "serious drug offense" under the career offender and ACCA enhancements. Namely, this Court has held that ***purchasing*** with intent to distribute is not a "controlled substances offense" under the career offender enhancement. *Shannon*, 631 F.3d at 1187, 1189–90 & n.3. But ***possession*** with intent to distribute, on the other hand, is a "serious drug offense"

34

under the ACCA. *James*, 430 F.3d at 1155–56. The PSI stated that Vinales was arrested after police found him in possession of 183 grams of cocaine. While it is unclear whether that description relied on the type of documents required by *Shepard v. United States*, 544 U.S. 13 (2005), Vinales did not object. Therefore, the District Court was entitled to rely on the uncontroverted statement that Vinales possessed 183 grams of cocaine—well over the 28 grams needed to infer intent to distribute under the statute. *See United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006) ("It is the law of this circuit that a failure to object to the allegations of fact in a PSI admits those facts for sentencing purposes."); *United States v. Hedges*, 175 F.3d 1312, 1315 (11th Cir. 1999). Hence, Vinales cannot establish plain error in the District Court's use of his cocaine trafficking conviction as a predicate offense because he cannot show that his offense was merely for purchasing (without intent to distribute), or otherwise outside the definitions of "controlled substances offense" or "serious drug offense." *See Shannon*, 631 F.3d at 1187, 1189–90 & n.3; *James*, 430 F.3d at 1155–56.

Because Vinales' convictions for resisting arrest with violence, fleeing and eluding police at high speed, and cocaine trafficking all qualified as predicate offenses, and were committed on different occasions, the District Court did not err in applying the career offender and ACCA enhancements. And because these three

35

convictions qualify as predicate offenses, it is unnecessary to address whether Vinales' other prior convictions qualify as predicate offenses.

Finally, Vinales argues that the residual clauses of the career offender and ACCA enhancements are unconstitutionally vague.  We again note that the ACCA's residual clause is virtually identical to the career offender enhancement's residual clause—both define a "violent felony" or "crime of violence" as any offense that involves "conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii); U.S.S.G. § 4B1.2(a)(2).  Vinales' argument is flatly foreclosed by binding Supreme Court and Eleventh Circuit precedent.  *See James v. United States*, 550 U.S. 192, 210 n.6 (2007) (rejecting the argument "that the [ACCA's] residual provision is unconstitutionally vague"); *Sykes*, 131 S. Ct. at 2277 (the ACCA's residual clause "states an intelligible principle and provides guidance that allows a person to conform his or her conduct to the law") (internal quotation marks omitted); *United States v. Gandy*, 710 F.3d 1234, 1239 (11th Cir. 2013) (rejecting the contention that the ACCA is unconstitutionally vague, citing *Sykes*); *United States v. Chitwood*, 676 F.3d 971, 978 n.3 (11th Cir. 2012), *cert. denied* 133 S. Ct. 288 (2012) (stating that the position taken by the Supreme Court in *Sykes* appears to foreclose lower courts from concluding that the residual clause is unconstitutionally vague).  Accordingly,

36

we must reject Vinales' argument that the residual clauses are unconstitutionally vague and affirm his sentence.

## IV. Conclusion

Based on the foregoing and our review of the record and the Parties' briefs, we affirm Defendant's convictions and sentence.

**AFFIRMED.**